**GENERAL ELECTRIC COMPANY, Plaintiff,**

v.

**Robert C. SEAMANS, Jr., Defendant, and Philco-Ford Corporation, Intervenor.**

**Civ. A. No. 248–72.**

United States District Court, District of Columbia.

March 24, 1972.

Alan Y. Cole and Isaac N. Groner, Washington, D. C., for plaintiff.

Joseph M. Hannon, Washington, D. C., Robert S. Rankin, Jr., Durham, N. C., for defendant.

W. Stanfield Johnson, Washington, D. C., for intervenor.

RICHEY, District Judge.

In this case the Court has enjoined the United States Air Force and the Philco-Ford Corporation (Philco) from taking any further action to effectuate or implement the award of Contract FO4701–72–C–003, dated December 15, 1971, to Philco, until the General Accounting Office has rendered a decision on plaintiff's protest against that award and action by the Air Force in accordance with that decision.

Basically, the procurement in question involves the operation and maintenance of six remote tracking stations which are considered an integral part of the Department of Defense satellite systems. The original procurement of these services was on a sole source basis without competition. Four of the tracking stations have been operated and maintained by Philco-Ford, and the remaining two stations were serviced by Lockheed Missile and Space Company. In early 1971, as a result of the stabilization of the growth and complement of equipment of these stations and a study, the Air Force decided to obtain these services by competitive procurement. See, Rosen Supp. Aff. ¶¶ 3–5; Norman Supp. Aff. ¶¶ 4–5. Under the terms of the proposal and the applicable regulations, the procurement was carried out in two phases. The first phase involved a determination as to which contractor's proposal fell within a competitive range for negotiations. The second phase was the negotiations. On October 6, 1971, General Lewis S. Norman, Jr., the Source Selection Authority, decided that three of the seven proposers were not within a competitive range. On October 8, 1971, the fourth finalists, who included General Electric, Philco-Ford and Lockheed, were notified that their original proposals fell within a competitive range and that they were therefore selected for further negotiation. On October 20, 1971, each of the four proposers within the competitive range was sent a letter which included a list of deficiencies which the offeror would have an opportunity to correct. See, Defendant's Exhibits C, D and E. This letter was the only "negotiation" conducted by the Air Force with respect to this procurement. On November 8, 1971, all of the finalists submitted their revised proposals for consideration by the Source Selection Evaluation Board, the Source Selection Advisory Council, and finally the Source Selection Authority. See, Rosen Supp. Aff. ¶¶ 17, 18,

22A. In its revised proposal GE reduced its price by $1,200,000 while Philco-Ford reduced its cost by approximately $7,100,000. On or about November 9, 1971, the Defense Contracts Audit Agency audited GE's revised proposal, but it never advised GE that there were any problems in relation to its proposed costs. On December 2, 1971, the Source Selection Advisory Council made its report to the Source Selection Authority, where it "concluded that there were serious deficiencies in several key areas when the technical proposal, as revised, was analyzed in context with the cost proposal." *See*, Norman Supp. Aff., Exh. N, at 6. On December 2, 1971, the Source Selection Authority issued a decision to award the contract to Philco-Ford. *See*, Norman Supp. Aff., ¶ 30, Exh. O. In this decision, the Authority recognized that GE "submitted a bid significantly lower than [Philco]," however, it was stated that "the significantly lower price proposed by [GE] is determined to be unrealistically low." *See*, Norman Supp. Aff., Exh. O, at 2. On December 16, 1971, upon receipt of the telegram advising it of the award of the contract to Philco-Ford, GE requested an immediate debriefing. This debriefing was held on January 4, 1972, at which time GE was informed for the first time that its cost proposal was considered to have been unrealistically low. *See*, Holloway Aff. ¶ 7. On or about January 19, 1972, GE filed its protest with the General Accounting Office, and on February 8, 1972 it filed this action for injunctive relief pursuant to 28 U.S.C. §§ 1331, 1361 (1970); 11 D.C.Code § 501 (1967 ed., Supp. IV); and Section 10 of the Administrative Procedure Act, 5 U.S.C. § 702 (1970).

After hearing oral arguments by counsel for all parties and giving full consideration to the extensive record, affidavits and memoranda filed herein with respect to the plaintiff's Motion for a Preliminary Injunction, this Court granted plaintiff's motion on March 6, 1972, in accordance with its *Findings of Fact and Conclusions of Law* (incorpo-

rated herein by reference) entered on that date, and ordered a bond for Security for Costs to be posted in the amount of $100.00. The purpose of this opinion is to discuss some of the highlights of the case and the various issues raised in this proceeding.

In Virginia Petroleum Jobbers Association v. Federal Power Commission, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958), the United States Court of Appeals for the District of Columbia defined the criteria which must be taken into consideration prior to the issuance of a preliminary injunction. They are as follows:

(a) That the petitioner has a strong likelihood of prevailing upon the merits;

(b) That the petitioner would be irreparably injured without such relief;

(c) That a stay or injunction would not substantially harm other interested persons;

(d) That the public interest will not be significantly harmed.

In addition to these four criteria for issuing a preliminary injunction, the United States Court of Appeals for the District of Columbia in Steinthal and Co., Inc. v. Robert C. Seamans, Jr., 455 F.2d 1289, opinion filed October 14, 1971, stated that the following two interrelated principles must be taken into consideration where determinations of procurement officials are challenged:

"(1) courts should not overturn any procurement determination unless the aggrieved bidder demonstrates that there was no rational basis for the agency's decision; and (2) even in instances where such a determination is made, there is room for sound judicial discretion, in the presence of overriding public interest considerations, to refuse to entertain declaratory or injunctive actions in a pre-procurement context." Steinthal and Co., Inc. v. Robert C. Seamans, Jr., *supra* at 1301.

The government and the intervenors have argued that the above principles places in *Steinthal, supra*, a strict limita-

tion on the landmark decision by the United States Court of Appeals in Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970). In *Scanwell* the court held that a party, which was denied a government contract as a result of alleged illegal activity on the part of the federal agency in letting the contract to another bidder, had standing under the Administrative Procedure Act, 5 U.S.C. § 701(a) (2) (1970), to bring suit for declaratory and injunctive relief in order to determine the validity of the agency's action. In its opinion, the court stated:

> "Of course it is true that the grant of standing must be carefully controlled by the exercise of judicial discretion in order that completely frivolous lawsuits will be averted. There must be a practical separation of the meritorious sheep from the capricious goats—a recognition that *cucullus non facit monachum*. However, responsible federal judges will be able to discern a case in which there is injury in fact, a sufficient adversary interest to constitute a case or controversy under Article III, and an otherwise reviewable subject matter to prevent the dockets from becoming overcrowded. The Court should have discretion to grant standing, provided the other criteria listed above are properly met." 424 F.2d at 872.

■ This Court's *Findings of Fact and Conclusions of Law* clearly demonstrate that the case at bar is one of the "meritorious sheep" as described by the Court of Appeals in *Scanwell, supra* 424 F.2d at 872. After carefully examining the extensive record with respect to the negotiation of the contract, this Court concluded that the Air Force transgressed the statutory boundaries set by the Armed Services Procurement Regulations (ASPR) and that the defendant arrived at a determination which was not reasonable. Furthermore, the Court concluded that the overriding public interest required the issuance of the preliminary injunction in order to insure

that the Air Force was complying fully with ASPR.

## PLAINTIFF HAS LIKELIHOOD OF SUCCESS ON THE MERITS

■■ In the Wheelabrator Corporation v. John H. Chafee, D. C. Cir., 455 F. 2d 1306, opinion filed October 14, 1971, the United States Court of Appeals made the following comment with respect to probability of success on the merits:

> "In view of the public interest in expeditious procurement a preliminary injunction cannot be justified unless the court makes a considered judgment of a probability of success on the merits. Likelihood of success is a requirement of an injunction even though the court's probing and analysis may not be as comprehensive when its injunction is limited to the period required for a determination by the GAO on the protest." at 1317.

This court concluded that the plaintiff has sufficiently demonstrated its probability of success on the merits. From the *Findings of Fact and Conclusions of Law* filed herein by the Court in support of the issuance of the preliminary injunction, it is clear that the Air Force failed to comply with their own regulations during the negotiations prior to the award of the contract to Philco. For example, ASPR § 3–805.1(a) (v) provides:

> "In any case where there is uncertainty as to the pricing or technical aspects of any proposals, the contracting officer shall not make award without further exploration and discussion prior to award."

The Air Force has argued that its letter to GE which notified the corporation of its placement in the competitive range, asked for proposal revisions, dated October 20, 1971, gave the plaintiff adequate notice of the concern over GE's "unrealistic cost estimates." *See*, Defendant's Exhibit D. The Court has carefully read the letter sent to GE, and it has compared it with the letters sent to Philco and Lockheed. The letter was in no

way sufficient to place GE on notice that its cost proposal was unrealistic. The letter simply stated information which the Air Force found to be omitted in GE's original proposal. Subsequently, GE supplied as much of this information as could be acquired when it submitted its revised proposal on November 8, 1971. The report by the Source Selection Advisory Council, dated December 2, 1971, makes it obvious that the Air Force was uncertain about GE's cost proposal, but it failed to explore this uncertainty as required by its own regulations prior to the award of the contract.

█ The record also discloses that the Air Force refused to supply GE with Volume III of a publication entitled *Personnel Planning Information for Satellite Control Facilities.* This volume describes in detail the contractor's manning for training and maintenance functions at the Sunnyvale Headquarters of the contractor. It should also be noted that Philco prepared this volume for the Air Force. The Court believes that GE was severely prejudiced in the bidding process because of the lack of this information, and furthermore that this was a major factor which led to the downgrading of GE's technical as well as cost proposals.

█ Finally, the record indicates that Space and Missile Systems Organization, Air Force, Regulation 70–10, Paragraph 6(g), in particular, was violated in this case by the failure of the Air Force to score the revised proposals numerically. There appears in the record and in the regulation no sanction for avoiding numerical scoring at the second, decisive phase of the two-phase negotiations, nor is there in this record any authorization for deviations from the language of the regulation requiring scoring. The result of failing to score numerically was that the cost estimates and the technical evaluation became inextricably entwined.

█ The Court concluded that the Air Force's failure to comply with its own regulations constituted an abuse of

discretion on its part which precluded it from reaching a reasonable and rational determination on awarding the contract, and which was sufficient enough to demand the issuance of the preliminary injunction in this case.

## PLAINTIFF WOULD BE IRREPARABLY INJURED WITHOUT SUCH RELIEF

█ The government and the intervenors have argued that the plaintiff has the availability of a damages remedy in the Court of Claims, and therefore they contend that a preliminary injunction should not issue. See, Keco Industries Inc. v. United States, 192 Ct.Cl. 773, 784–785, 428 F.2d 1233, 1240 (1970); Robert F. Simmons and Associates v. United States, 175 Ct.Cl. 510, 360 F.2d 962 (1966); Heyer Products Co. v. United States, 135 Ct.Cl. 63, 140 F.Supp. 409 (1956); 147 Ct.Cl. 256, 177 F.Supp. 251 (1959). However, this remedy does not adequately compensate the frustrated bidder's losses entirely, since it provides damages only to the extent of the bid preparation costs. This is not sufficient in cases such as the case at bar. The Court does not believe that the procurement contract in the instant case is the "kind of urgent matter . . . warrant[ing] dismissal for want of equity" the plaintiff's request for injunctive relief regardless of the strength of the plaintiff's claim on the merits. Steinthal & Co., Inc. v. Robert C. Seamans, Jr., D.C.Cir., 455 F.2d 1289 at 1302, decided October 14, 1971. *The record indicates that both Lockheed and Philco will continue to maintain and operate the remote tracking stations in question until further notice or orders from this Court, thus providing the necessary flawless and uninterrupted service required by our national defense and also negating the urgency of proceeding under the new contract until the issues raised in this proceeding are finally determined.* (Emphasis added)

## THE INJUNCTION WILL NOT SUBSTANTIALLY HARM OTHER INTERESTED PERSONS

The government and Philco have estimated damages of approximately $660,000 should the preliminary injunction continue over sixty days. The Court does not agree with this contention. First, the record shows that the present contract under which Philco operates will pay them more than they will receive under the new contract, thus mitigating any injury to their interests. Secondly, should GE prevail in its protest and succeed in its lawsuit, the government will save almost $5 million dollars. Lastly, both the government and Philco can assist GAO in reaching a decision on GE's protest by prompt filing of their oppositions. This Court has already represented its willingness to expedite matters whenever it can be of assistance to the parties.

## PUBLIC INTEREST WILL BE SERVED

There is little doubt that the overriding public interest lies in having the governmental agencies follow their own regulations. Scanwell Laboratories, Inc. v. Shaffer, *supra* at 424 F.2d 864. These regulations are the public's only assurance that the procurement activities of the government do not "deteriorate into actions reflecting personal predilictions of administrative officials, whether ascribable to whim, misplaced zeal, or impermissible influence." Steinthal v. Seamans, *supra* at 1305. The facts in the instant case exemplify the very situation which the Court of Appeals sought to remedy by its decision in *Scanwell, supra*. This Court's *Findings of Fact and Conclusions of Law* describe the government's failure to comply with their own procurement regulations in awarding the contract to Philco-Ford. The Court was not diverted in its decision to grant the preliminary injunction by the government's attempt to hide behind the shield of national defense policies. Again it should be emphasized that Lockheed Aircraft Corporation and Philco-Ford will continue to maintain and operate the satellite tracking stations in question until further order of this Court, thus preventing any interruption in the services which are necessary for national security purposes. Finally, it should be noted that the duration of the injunction is limited to the time needed for the General Accounting Office to render its decision on GE's pending protest. *See,* Steinthal v. Seamans, *supra* at 1305.

## RELEVANT DECISIONS OF THE GAO SUPPORT THIS COURT'S FINDINGS OF FACTS AND CONCLUSIONS OF LAW TO THE EFFECT THAT NEGOTIATIONS MUST BE CONDUCTED IN GOOD FAITH AND IN ACCORDANCE WITH THE ASPR.

The General Accounting Office has clearly advised the Secretary of the Air Force and other department heads that negotiations must be meaningful and be conducted in good faith and in accordance with ASPR. In a recent decision by the GAO it was stated:

"The first evaluation found significant exceptions in MRC's proposal (Option I), however, such exceptions were not considered disqualifying. Although the second evaluation found additional exceptions, the record does not show that the proposal was considered to be so materially deficient that it could not have been made acceptable through minor revisions or modifications. We believe that additional negotiations subsequent to the second report should have been conducted to have made it clear to MRC that revisions to their offer with regard to these exceptions were necessary to make their offer acceptable. Although we do not intend to outline the extent of negotiations in each procurement situation, unless initially unacceptable proposals are found not subject to being made acceptable, except through major revisions, prospective contractors should be afforded an opportunity to satisfy the requirements of the Government, rather than close the door to

possible fruitful negotiations. ASPR 3–805.1(b) states, in connection with discussions conducted with offerors who submit proposals within a competitive range that:

'* * * all offerors selected to participate in such negotiations * * * shall be offered an equitable opportunity to submit such price, technical, or other revisions in their proposals as may result from the negotiations * * *'

It is a well-established principle in negotiated procurements that such discussions must be meaningful and furnish information to all offerors within the competitive range as to the areas in which their proposals are deficient so that competitive offerors are given an opportunity to fully satisfy the Government's requirements. A basic purpose of such procurements is not to discard initial proposals, because they may not be fully responsible to stated specifications, but to determine whether such deficient proposals are reasonable subject to being made acceptable through discussions." Decision of Comptroller General, B–173522 at 1–2 (January 25, 1972).

 The Court recognizes that the negotiation process must necessarily be flexible, especially since the contracting agencies have wide discretion in determining the nature and scope of negotiations. However, the flexibility of the negotiation process is not without limits. The contracting agency must treat all competitive offerors impartially and fairly during the course of the negotiations. Furthermore, each offeror must have an equal opportunity for discussion and submission of revisions as required by 10 U.S.C. § 2304(g) (1970) and the implementing regulations, particularly ASPR 3–805.1(b). See, Decision of Comptroller General, B–169633 at 3 (August 20, 1970). This Court's *Findings of Fact and Conclusions of Law* demonstrate that the negotiation process in the case at bar was not conducted in a fair and impartial manner. For example, the failure of the Air Force to give GE Vol-

ume III of the publication entitled *Personnel Planning Information for Satellite Control Facilities* with the knowledge that two other bidders, Philco-Ford and Lockheed, had ready access to this volume clearly shows a violation of the Air Force's obligation to conduct fair and impartial negotiations. There is no question but that the information contained in this volume would have been of significant importance to GE in the preparation of its revised proposal. It was never satisfactorily explained to the Court why GE was refused the volume.

### CONCLUSION

This Court is cognizant of its position in the governmental scheme in relation to the Executive and Legislative Branches, and it *realizes that it is in no position to substitute its own determination for that of the Executive department or agency.* The United States Court of Appeals for the District of Columbia in Calcutta East Coast of India and East Pakistan/USA Conference v. Federal Maritime Commission, 130 U.S.App.D.C. 261, 264, 399 F.2d 994, 997 (1968) approved judicial intervention when it is *"rested upon a demonstration that the agency action has transgressed the statutory boundaries."* (Emphasis supplied.) Judicial intervention was necessary in the case at bar because the Air Force transgressed its statutory boundaries by failing to follow its own regulations and because it did not engage in good faith negotiations regarding this contract.

Finally, the Court's Order granting the Preliminary Injunction herein contains the language present therein because the case was virtually submitted to the Court on its full merits. Indeed, in light of the government's Motion for Summary Judgment and exhibits attached thereto as well as the plaintiff's opposition thereto, it is clear that the same evidence would have been presented at a trial on the merits as was presented below. As the United States Court of Appeals for the District of Columbia stated in Wheelabrator v. Chafee, *supra* at 1317: "[T]he court does have the

last word and should not shrink from exercise of its power when the conditions justify an injunction." Since the very integrity of the competitive bid system in awarding government contracts was at stake, the Court felt compelled to issue the preliminary injunction in the case at bar. To have acted otherwise would have been contrary to this Court's obligation to protect the public's interest in a case of this vast importance.