ALLIS–CHALMERS CORPORATION,
Hydro-Turbine Division, Plaintiff,

v.

Commissioner Joseph F. FRIEDKIN
et al., Defendants.

Civ. A. No. 79–1153.

United States District Court,
M. D. Pennsylvania.

Jan. 3, 1980.

Thomas A. Schmutz, Washington, D. C., William J. Flannery, Morgan, Lewis & Bockius, Harrisburg, Pa. (Morgan, Lewis & Bockius, Washington, D. C., of counsel), William P. Schuster, Milwaukee, Wis., for Hydro-Turbine Division, Allis Chalmers Corp.

Paul H. Rhoads, R. Stephen Shibla, Rhoads, Sinon & Hendershot, Harrisburg, Pa., Morgan Hunter, McGinnis, Lochridge & Kilgore, Austin, Tex., for South Texas Electric Cooperative, Inc. and Medina Electric Cooperative, Inc., intervenors.

Edward K. Allison, San Francisco, Cal., Lewis S. Kunkel, Jr., Pepper, Hamilton & Scheetz, Harrisburg, Pa., for Hitachi America, Ltd.

Jerome H. Gerber, Handler & Gerber, Harrisburg, Pa., for International Ass'n of Machinists & Aerospace Workers.

Paul J. Killian, Asst. U. S. Atty., Harrisburg, Pa., Catherine A. Ribnick, Civil Division, Federal Programs Br., U. S. Dept. of Justice, Washington, D. C., J. Michael Cavanagh, Graham & James, Washington, D. C., for the Government.

## MEMORANDUM

HERMAN, District Judge.

## I. INTRODUCTION

### A. Buy-American Act

In 1933 the United States Congress enacted the Buy American Act to protect American interests in contracts for the procurement of government supplies and construction. Buy American Act of March 3, 1933, P.L. 428, Tit. III, *as amended,* 41 U.S.C. §§ 10a–10d. The concerns expressed by the Congressmen who supported the Act through its passage were uniformly related to the protection of both American industry and American labor.[1] Congress feared, especially during the Depression, that foreign businesses could use their cheap sources of labor to badly undercut the bids of American concerns.[2] The fear was that the higher standard of living for American laborers resulting from higher wages would backfire and lead to a loss of jobs if American businesses lost contracts and were forced to shut down.

---

1. *See, e. g.,* 75 Cong.Rec. 3172 (1933); 75 Cong. Rec. 3254 (1933).

   At the time the bill was under consideration, one specific project, for the construction of the Boulder Dam, was brought to Congress' attention in which a foreign bidder competed with American interests. German bidders threatened to win a $6,000,000 contract from the government for the supply of hydro-electric turbines. 75 Cong.Rec. 3267 (1933).

2. 75 Cong.Rec. 3257 (1933). Congress · also feared the possibility of foreign companies "dumping" their products into the American market. But because Congress has recently enacted an amendment to the Tariff Act of 1930 in which an antidumping duty is imposed, we believe that the principal remaining rationale for the Buy American Act is the potential for cheap foreign labor to undercut American industry. *See* Trade Agreements Act of 1979, July 26, 1979, P.L. 96–39, Tit. I, 93 Stat. 150 *et seq.,* § 101, *amending* Tariff Act of 1930, Tit. VII, subtit. B., § 731, 19 U.S.C. § 1673.

The thrust of the Act is to require the use of American-made articles, materials, and supplies in government construction unless such use is "inconsistent with the public interest" or the department head determines "the cost to be unreasonable". 41 U.S.C. § 10a. This broad-reaching congressional mandate left a great deal to be determined by the contracting government agency whose duty it was to apply the Act. To aid in establishing a more precise application of the policy underlying the Act, President Eisenhower implemented an order designed to explain ambiguous terms. Exec. Order No. 10582, Dec. 17, 1954, 19 F.R. 8723, *as amended by* Exec. Order No. 11051, Sept. 27, 1962, 27 F.R. 9683 *cited following* 41 U.S.C.A. § 10d. The Act is further clarified and defined by the Federal Procurement Regulations (hereafter referred to as "FPR"), 41 C.F.R. §§ 1–6.1 *et seq.* and §§ 1–18.600 *et seq.*

B. *The Statutory and Regulatory Framework*

Sections 10a and 10b(a) provide the principal language of the Act. In 1949, however, Congress attempted to clarify the intent with which it passed both of the above sections. Act of October 29, 1949, C. 787, Tit. VI, § 633, 41 U.S.C. § 10d. This clarification of the "original intent" of Congress in 1933 states that sections 10a and 10b(a)

requir[e] the purchase, for public use within the United States of articles, materials, or supplies manufactured in the United States in sufficient and reasonably commercial quantities and of a satisfactory quality, unless the head of the department or independent establishment concerned shall determine their purchase to be inconsistent with the public interest or their cost to be unreasonable.

The Executive Order promulgated by President Eisenhower was designed to ensure uniform application of the general requirements of the Buy American Act. *In re Fairbanks, Morse & Company*, 41 Comp. Gen. 70 (1961). The Order effectively declared that the amount of an American bid was "unreasonable" if it was more than six percent greater than a foreign bid. The relevant portions of the amended Executive Order No. 10582 are as follows:

Section 1. As used in this order, (a) the term "materials" includes articles and supplies, (b) the term "executive agency" includes executive department, independent establishment, and other instrumentality of the executive branch of the Government, and (c) the term "bid or offered price of materials of foreign origin" means the bid or offered price of such materials delivered at the place specified in the invitation to bid including applicable duty and all costs incurred after arrival in the United States.

Sec. 2. (a) For the purposes of this order materials shall be considered to be of foreign origin if the cost of the foreign products used in such materials constitutes fifty per centum or more of the cost of all the products used in such materials.

(b) For the purposes of the said act of March 3, 1933 [sections 10a–10c of this title], and the other laws referred to in the first paragraph of the preamble of this order, the bid or offered price of materials of domestic origin shall be deemed to be unreasonable, or the purchase of such materials shall be deemed to be inconsistent with the public interest, if the bid or offered price thereof exceeds the sum of the bid or offered price of like materials of foreign origin and a differential computed as provided in subsection (c) of this section.

(c) The executive agency concerned shall in each instance determine the amount of the differential referred to in subsection (b) of this section on the basis of one of the following described formulas, subject to the terms thereof:

(1) The sum determined by computing six per centum of the bid or offered price of materials of foreign origin.

\*     \*     \*     \*     \*     \*

The final set of guidelines for awarding government procurement contracts is found in the FPR. These regulations provide the most detailed requirements concerning the application of the Buy American Act to

government contracts. The section primarily applicable to the matter under our consideration is section 1–6.104–4(a) and (b):

§ 1–6.104–4  *Evaluation of bids and proposals.*

(a) Unless otherwise determined by the head of the agency in accordance with the Buy American Act, where the procedures in this § 1–6.104–4 result in the acquisition of foreign end products, the acquisition of domestic source end products would be (1) unreasonable in cost or (2) inconsistent with the public interest (see § 1–6.103–3).

(b) Except as provided in paragraph (d) of this section, bids and proposals shall be evaluated as provided in this section so as to give preference to domestic bids. Each foreign bid shall be adjusted for purposes of evaluation by adding to the foreign bid (inclusive of duty) a factor of 6 percent of that bid, except that a 12 percent factor shall be used instead of the 6 percent factor if the firm submitting the low acceptable domestic bid is a small business concern or a labor surplus area concern (as defined in §§ 1–1.701 and 1–1.801, respectively), or both. However, if an award for more than $100,000 would be made to a domestic concern if the 12 percent factor is applied, but would not be made if the 6 percent factor is applied, the case shall be submitted to the head of the agency for decision as to whether the award to the small business concern or labor surplus area concern would involve unreasonable cost or inconsistency with the public interest (see § 1–6.103–3). If the foregoing procedure results in a tie between a foreign bid as evaluated and a domestic bid, award shall be made on the domestic bid. When more than one line item is offered in response to an invitation for bids or request for proposals, the appropriate factor shall be applied on an item-by-item basis, except that the factor may be applied to any group of items as to which the invitation for bids or request for proposals specifically provides that award is to be made on a particular group of items.

## II.  FACTUAL BACKGROUND

### A.  The Project

We need resolve no material differences in factual matters in the present controversy. All parties agree to the principal facts in evidence. We need only state the facts and apply the statutory and regulatory requirements to them.

The United States and Mexico entered a treaty on February 3, 1944 that authorized construction of two multi-purpose storage dams and hydro-electric power plants on the Rio Grande River. The Defendant United States Section of the International Boundary and Water Commission (hereafter referred to as "the Section") subsequently built the Falcon and Amistad Dams and constructed a hydro-electric power plant at the Falcon damsite. The matter presently before us concerns a contract for the construction of a hydro-electric plant at the Amistad damsite.

The congressional authorization for the construction of the Amistad power plant requires that it be self-liquidating. 22 U.S.C. §§ 277d–13 to 277d–16. Although the United States will build, operate and maintain the facility, the purchaser of the generated power must agree to reimburse the government for all construction costs, interest, and operating and maintenance expenses. 22 U.S.C. § 277d–14.

On August 9, 1977 the Bureau of Reclamation of the Department of the Interior entered into a contract with the South Texas Electric Cooperative, Inc. and Medina Electric Cooperative, Inc. (hereafter referred to together as "STEC/MEC"), for the sale and purchase of the United States' share of the electrical power generated from the Amistad plant. The terms of the contract provide that STEC/MEC will pay the construction and operational costs of the project to ensure that it is self-liquidating.

For construction of the power plant at Amistad, the Section entered into an agreement with the Army Corps of Engineers (hereafter referred to as "the Corps") on August 22, 1977. The Corps agreed to act

as the Section's engineer-representative in supervising the development of the technical design, plans, and specifications for the plant.

The Corps' Southwest Division (hereafter referred to as "the Division") undertook the responsibilities of engineer-representative to recommend the award of manufacturing and construction contracts and to supervise the construction of the plant. The Division subsequently directed its Fort Worth District (hereafter referred to as "the District") to solicit bids for all procurements involved. This task required drafting all of the required bids, advertising the bid solicitations, receiving, opening, and evaluating the bids, and recommending the awards be made to specific bidders. The initial procurement, about which the entire project revolved, was for the massive hydro-turbines. The solicitation and evaluation of the bids for supplying this material are the subject of the present litigation.

### B. *The Bid Solicitation*

In preparing the draft solicitation for bids for the Amistad turbines, the District used the format employed by the Seattle District of the Corps when that District awarded a contract for hydro-turbines in the Libby Dam project. The successful bidder in the Libby construction was the original Plaintiff in this action, the Allis-Chalmers Corporation (hereafter referred to as "Allis-Chalmers"). Adhering exactly to the Seattle format, the District used the documentary materials drafted by the Corps' North Pacific Division. The North Pacific Division was suited for such an advisory position because of its recent experience in the Northwest with hydro-electric projects. In assembling the numerous technical and non-technical contractual provisions, the North Pacific Division followed the Corps' standard guide specifications, including CE 1101.01 for Nontechnical Contract Provisions. CE 1101.01 contained a standard General Condition Three which was properly incorporated into the solicitation for bids. General Condition Three, relating to the application of the Buy American Act to the

project, was required by CE 1101.01, has been used in the present form since 1970, and appeared in the Libby Dam contract awarded to Allis-Chalmers.

General Conditions 3.2 and 3.3 of the bid solicitations provide:

GC–3.2 End products are the items to be delivered to the Government, as specified in the contract, including supplies to be acquired by the Government for public use in connection with service contracts, but excluding installation and other services to be performed after delivery.

GC–3.3 When the services of erecting engineers are specified the bid amount in the Schedule for Services or Erecting Engineers will be subtracted from the bid amount before application of the Buy American Act.

The invitation for bids, IFB 79–3, ultimately published by the District consisted of a variety of technical and nontechnical specifications and other provisions prescribed by the Federal Procurement Regulations. The District followed the FPR rather than the Defense Acquisition Regulations normally used by the Corps because the contracting agency was the civilian Section.

The Corps traditionally procured turbines from a manufacturer for delivery to the jobsite where a general contractor would thereafter install them, when appropriate, into the power plant under construction. The North Pacific Division, however, broke from that tradition and called for bids on both the manufacture and the installation of the turbines from all companies. The two segments, manufacture and installation, continue to have separate, independent bid prices, but the same company bids on both even if it is not the general contractor. This procedure was adopted by the District in the Amistad project.

The District issued the bid invitations, IFB 79–3, on March 13, 1979. It received bids soon thereafter and opened them for evaluation on June 8, 1979.

## C. *Bid Evaluation and Award*

In evaluating the submitted bids, the Contracting Officer of the Corps was expressly authorized by the bid solicitation to deduct the unit price cost of model turbine tests if the bidder had previously conducted such tests and submitted sufficient data to enable the Contracting Officer to judge the acceptability of the prior tests. The solicitation for bids also required the deduction from the bid price of any prompt payment discounts offered to the bidder. The solicitation further required the addition to any foreign bids of an amount that covered foreign testing.

In response to the solicitation for bids to supply the hydro-turbines, five companies submitted bids to the Section. Allis-Chalmers, the sole domestic bidder, submitted an unevaluated lump sum bid of $4,005,800 for manufacture and installation of the turbines. Hitachi America, Ltd. (hereafter referred to as "Hitachi"), the lowest foreign bidder, submitted an unevaluated lump sum bid of $3,400,000.

The solicitation for the hydro-turbine bids in the Amistad project noted that all contract awards were subject to the requirements of the Buy American Act. As interpreted by the Executive Order and the FPR, the Act requires the Section to add a six percent differential to the low foreign bid unless the low domestic bidder is a labor surplus area concern. In the latter event, a twelve percent differential is applied. The issues confronting us in this case arise from the Section's application of the differential to Hitachi's bid. First, should the differential have been six or twelve percent? Second, should the differential be applied only to the manufacturing and supplying the turbines to the railsite at Del Rio, Texas, or should it also be applied to the assembly and installation of the turbines performed at the damsite?

To determine whether the six or twelve percent differential should be applied to Hitachi's bid, the District contacted the United States Department of Labor to find if the city of York, Pennsylvania was a labor surplus area. The District specified the *city* of York because Allis-Chalmers, in designating its East Berlin Road plant as the principal place of performance, identified the city of York as the political subdivision in which that plant is located. Because the Department of Labor considered the city of York as a labor surplus area, the District applied the twelve percent differential to the Hitachi bid. The District then followed General Conditions 3.2 and 3.3 and what it perceived to be the requirement of 41 C.F.R. § 1–16.901–32 and the other pertinent regulations and subtracted bid items 17 (install turbines) and 18 (services of erecting engineers) from Hitachi's total bid. Thus $999,550 was deducted from Hitachi's unevaluated lump bid of $3,400,000.

The District applied the twelve percent differential to the result, added the two figures together, added $60,000 for foreign inspection, and added the deducted bid items 17 and 18 back into the total. Hitachi's final evaluated bid was therefore $3,748,054.

The District deducted the test costs of $198,750 from Allis-Chalmers' bid and deducted the discounts of $38,070.50. The final evaluated bid of Allis-Chalmers was $3,768,979.50, or approximately $20,000 higher than that of Hitachi. Accordingly, on June 21, 1979 the District recommended to the Section that the contract be awarded to Hitachi.

On June 13, 1979 Allis-Chalmers had been informally advised by Mr. Joseph Raetz of the Corps that bid items 17 and 18 would be deducted from Hitachi's bid before application of the Buy American differential. In response to this communication, Allis-Chalmers advised Mr. Raetz on June 15, 1979 that subtraction of items 17 and 18 prior to application of the differential was contrary to law and that the differential must be applied to the entire foreign bid. On June 18, 1979 Allis-Chalmers was advised that the Corps had reviewed its letter of June 15, 1979, but had maintained its decision to deduct bid items 17 and 18 before applying the differential.

In the course of reviewing the Corps' recommendation that the contract be

awarded to Hitachi, the Section examined the documentation concerning the bid solicitations. The Section then questioned the District about the precise location of the East Berlin Road facility of Allis-Chalmers and whether it was within a labor surplus area. The District consulted the Department of Labor and learned that the East Berlin Road plant is not in the city of York, but is in West Manchester Township in the county of York. West Manchester Township is not a labor surplus area. On the basis of this information, the District concluded that a six percent rather than a twelve percent differential should be applied to the Hitachi bid. Whether the differential was six or twelve percent did not change Allis-Chalmers' position as a bidder, however, because Hitachi would continue to be the lowest bidder regardless of which differential were applied.

In July, 1979 Allis-Chalmers dispatched a telegram to the Section announcing its intention to have more than fifty percent of the costs in its bid performed in labor surplus areas. Allis-Chalmers received no reply to this telegram and assumed that the twelve percent differential would be applied. It was not until reading the report of the Section to the General Accounting Office (hereafter referred to as "the GAO") on or about August 9, 1979, that Allis-Chalmers learned that the six percent differential had been applied to the Hitachi bid.

On or about August 22, 1979 Defendant Joseph F. Friedkin, commissioner of the Section, advised the GAO that the Section intended to award the contract to Hitachi on or about September 6, 1979. On September 10, 1979 Allis-Chalmers received notice from Friedkin that the Section had awarded the contract to Hitachi on September 5, 1979. Hitachi may not, however, proceed to perform the contract until it receives official notice to proceed from the Section.

## III. PROCEDURAL HISTORY

### A. Administrative Protest

On June 22, 1979, by a letter to the Corps dated June 21, 1979, Allis-Chalmers officially protested the anticipated award of the contract to Hitachi. Allis-Chalmers requested that no contract be awarded until a final decision was reached on its protest. Because neither the Corps nor the Section responded to its protest, Allis-Chalmers protested the evaluation procedures to the GAO on June 28, 1979. Allis-Chalmers again requested that no action be taken in awarding the contract until the protest was resolved. The Section informed the GAO, by letter dated September 9, 1979, of its decision to award the contract to Hitachi notwithstanding the pendency of the Allis-Chalmers protest. After prolonged deliberation, the GAO issued its opinion denying the Allis-Chalmers protest on December 7, 1979. *In re Allis-Chalmers Corporation*, B-195311 (Dec. 7, 1979).

### B. The Present Action

On September 12, 1979 Plaintiff Allis-Chalmers filed its complaint in this court seeking a temporary restraining order and a preliminary injunction against the Section to stop it from issuing the notice to proceed to Hitachi. On September 13, 1979, following a hearing at which the Section was represented, we issued a restraining order directing that the Section not issue the notice to proceed. By consent of the parties, the order was extended to October 19, 1979 on which date we held the hearing on the preliminary injunction. On that date our restraining order was continued until our present decision on the preliminary injunction.

On September 28, 1979 Hitachi moved to intervene as a Defendant and we granted the motion on October 2, 1979. On October 4, 1979 the South Texas and Medina Electric Cooperative moved to intervene, also as a Defendant, and on October 11, 1979 Local Union 1400, International Association of Machinists and Aerospace Workers, AFL-CIO (hereafter referred to as "Local 1400") moved to intervene as a Plaintiff. Both of the latter motions were granted by our order of November 16, 1979.

Because we believe that the Section's award of the contract to Hitachi was in accordance with the mandates of the Act,

the Executive Order, and the FPR, we issued an order on December 7, 1979 dissolving our restraining order of September 13, 1979 and denying Allis-Chalmers' motion for a preliminary injunction. This memorandum of law is in support of that order.

### C. *Preliminary Injunction*

■ In approaching Allis-Chalmers' request for injunctive relief, we are faced with a variety of decisions establishing the standards by which we must proceed. Allis-Chalmers' original memorandum referred us to the traditional four-part test enunciated by our circuit court in *Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811 (3d Cir. 1978). The circuit listed the four requirements that must be met for a court to grant a preliminary injunction. The party moving for a preliminary injunction must show: 1.) A reasonable probability of eventual success on the merits; 2.) The movant will suffer irreparable injury if relief is not granted; 3.) The possibility of harm to other interested persons from the grant of the injunction does not outweigh the benefit to the movant; and 4.) The public interest is advanced by the grant of the injunction. 573 F.2d at 815.

Allis-Chalmers abandoned its reliance on the traditional balancing test of *Kreps* in its subsequent memorandum and referred us to numerous decisions from other federal courts in which injunctive relief was granted to disappointed bidders. *See, e. g., General Electric Company v. Seamans,* 340 F.Supp. 636 (D.C.D.C.1972); *Rudolf F. Matzer & Associates, Inc. v. Warner,* 348 F.Supp. 991 (M.D.Fla.1972).

Plaintiff finally urges us to apply the standard of review used by the District of Columbia Circuit Court in *M. Steinthal & Company, Inc. v. Seamans,* 147 U.S.App. D.C. 221, 455 F.2d 1289 (D.C.Cir.1971). *Steinthal* requires the moving party to prove that the government agency whose procurement contract award is under question transgressed the statutory boundaries within which it must operate.

■ We see no need, however, to adopt the District of Columbia test when a more recent Third Circuit decision controls our deliberation. *Sea-Land Service, Inc. v. Brown,* 600 F.2d 429 (3d Cir. 1979). The court in *Sea-Land* faced an action for injunctive and declaratory relief against the United States and its officers for the allegedly improper award of a procurement contract by the Navy. Our circuit court favorably cited the conclusion of the *Steinthal* tribunal that "the courts should not overturn any procurement determination unless the aggrieved bidder demonstrates there was *no* rational basis for the agency's decision." 600 F.2d at 434 (emphasis added). The court went on to establish the test with which we must approach the action presently before us: "A showing of *clear illegality* is an appropriate standard to impose on an aggrieved bidder who seeks judicial relief." 600 F.2d at 434 (emphasis added). The basis for placing such a heavy burden on an unsuccessful bidder rests with the great public interest in efficient government procurement and in avoiding excessive costs. Courts must recognize that judicial intervention into procurement contract protests causes delay in those contracts and increases costs, generally with little or no measurable benefit to the public. Under the four-part *Kreps* test, the fourth item (public interest) is judicially presumed to be so great in procurement contracts that the movant has the exceedingly difficult burden of firmly establishing the first item (likelihood of ultimate success on the merits) to our satisfaction.

Because we are required by *Sea-Land* to focus on the "ultimate success" requirement, the potentially irreparable injury to Allis-Chalmers (item two) and the harm caused by delay to the Section, Hitachi, and STEC/MEC (item three), become less significant in our deliberation. Although less significant in the face of the great public interest in efficient, timely government procurement, four of the interests of the parties presented to us in testimony retain some importance for us. The injury with which we are most distressed is the potentially great damage facing Allis-Chalmers.

The loss of this contract will unquestionably weaken the Hydro-Turbine Division of the parent corporation. We note, however, the absence of testimony or evidence that loss of this contract would result in the cessation of manufacturing by this sole remaining domestic supplier of large hydro-turbines. The second interest is the loss of substantial employment opportunities for the York area, most notably to Local 1400, if the contract is awarded to the foreign company.

The other two interests with which we are concerned result from any delay in the performance of this procurement contract. Mr. Thor Anderson, vice president of the architectural firm that designed the Amistad project, testified that any delay in the award of performance of the hydro-turbine contract would result in a commensurate delay in the completion of the entire project. Mr. William Robson, general manager of STEC/MEC, testified that any delay in the initial delivery of power from the hydro-turbines would have two results. First, the consumers of electrical power in the service area of STEC/MEC would be forced to pay the higher rates required by the greater costs of the non-hydroelectric power now being produced. Second, the power now supplied is generated from the combustion of gas and oil. Any delay in the completion of this project will unavoidably and unnecessarily drain this country's gas and oil reserves. In this time of a national energy emergency, we must be cognizant of such a result.

The great interest of the public generally, and of the consumers of electrical power within the relevant area of Texas particularly, in the speedy and efficient award of this essential government procurement contract necessitate our following the *Sea-Land*, "clear illegality" test in our deliberations of Allis-Chalmers' allegations.

■ A question arises about the various remedies that may be at our disposal to resolve this matter in a particular way. The court in *Sea-Land* was very clear in its holding that a federal district court does not have the power to order a government agency to award a contract to a particular bidder. On the other hand, the *Sea-Land* court encouraged enjoining the performance of a contract if it was awarded as the result of a clear illegality. What options are left open to us? Obviously we cannot order the Section to award the contract at issue to Allis-Chalmers. Similarly, we do not believe that we have the power to order the Section to refrain from awarding the contract to Hitachi. We have little guidance, however, on whether we can specifically order the Section to reconsider the bids or to have the parties re-bid the contract. We believe we cannot. It appears to us that the only possible action that would not impermissibly infringe upon the discretion of the Section would be to enjoin the performance of the present contract. We would leave the further decision about how to proceed with the contract to the Section's sound discretion.

As we indicated previously, Allis-Chalmers is disputing two decisions of the Section in evaluating the bids for the Amistad project. First, Allis-Chalmers insists it should receive the benefit of the twelve percent differential because it will incur a majority of the costs of the project in certified labor surplus areas. Second, Allis-Chalmers argues that the differential should be applied to the total bid of Hitachi for the turbines, including the installation and on-site engineering costs. If Allis-Chalmers is unsuccessful in convincing us that either of the two decisions is clearly illegal, its case must fall. A six percent differential applied to the entire bid price of Hitachi or a twelve percent differential applied to the bid price without items 17 and 18 would be insufficient to make Allis-Chalmers' evaluated bid lower than Hitachi's.

Neither counsel for Plaintiffs nor counsel for Defendants have referred us to any federal court decisions regarding either of these issues. Our own research has similarly failed to uncover any precedent on point. Our analysis of these matters, therefore, is that of a case of first impression for the federal judiciary. We will examine the is-

sue of the labor surplus area first and then review the application of the differential to the bid prices.[3]

## IV. *LABOR SURPLUS AREA CONCERN*

■ Executive Order 10582, section 3(c) provides a basis for extending special consideration under the Buy American Act to American concerns that conduct their business in areas of substantial unemployment. This policy is more fully implemented by the FPR. Section 1–6.104–4(b) provides, in relevant part: "[A] 12 percent factor *shall* be used instead of the 6 percent factor if the firm submitting the low acceptable domestic bid is a  .  .  . labor surplus area concern  .  .  .." (Emphasis added.) Sections 1–1.801(a) & (c) define labor surplus area concern as a concern that, together with its first-tier subcontractors, will perform substantially in a geographical area identified by the Department of Labor as an area of concentrated unemployment or underemployment or an area of labor surplus.

Our problem in this issue resulted from the failure of the Section to solicit, and of Allis-Chalmers to provide, sufficient information on which to base a meaningful decision about whether Allis-Chalmers is a labor surplus area concern. We agree with the Section that when the twelve percent differential was reduced to six percent, the Section had not acted arbitrarily, maliciously, or improperly. We also agree with Allis-Chalmers that it appears from the pleadings, documents, and testimony before us that Allis-Chalmers is a labor surplus area concern. At the very least, Allis-Chalmers is entitled to a review of whether the twelve or six percent differential should be applied.

Allis-Chalmers' position is essentially that the Section abused its discretion by not responding to Allis-Chalmers' telegram of July 16, 1979 with any requests for more information. The telegram stated that Allis-Chalmers intended to perform a substantial portion of the contract work in labor surplus areas in the city of York and on the jobsite in Texas. The Section responds that it did not contact Allis-Chalmers for further information because the question was academic, i. e., whichever differential were applied to the bifurcated bid price, Hitachi would remain the lowest bidder. Thus, it is clear that the Section made no decision about the eligibility of Allis-Chalmers to have the twelve percent differential applied.

The Comptroller General has ruled that information about a bidder's qualification as a labor surplus area concern may be submitted after the bids have been opened when the solicitation for bids fails, as here, to request the necessary information. Decision B–148720 (May 7, 1962) (letter to Secretary of the Navy); Decision B–146258, 41 Comp.Gen. 160 (August 28, 1961) (letter to Secretary of the Army).

In light of the above decisions of the Comptroller General and the mandate and policy of section 1–6.104–4(b), we agree with Allis-Chalmers that the Section abused its discretion by not initiating requests for additional information from Allis-Chalmers before awarding the contract to Hitachi. Whether the matter was academic (as the Section maintains) or not, it is the Section's responsibility to comply with the FPR. At the same time it is our "obligation to insure agency compliance with statutory and regulatory law." *Sea-Land Service, Inc. v. Brown, supra,* 600 F.2d 429, 434 (3d Cir. 1979).

---

3.  We reject the Section's contention that venue was improperly laid in this District. First, Allis-Chalmers is authorized by 28 U.S.C. § 1391(e)(2) to bring the action in the judicial district in which "the cause of action arose." Under this section, venue is proper in the district that bears a substantial relationship to the cause of action, *Lamont v. Haig,* 192 U.S.App. D.C. 8, 590 F.2d 1124 (D.C.Cir.1978), or where the injury resulting from the alleged wrongdoing is felt. *Township of Long Beach v. City of New York,* 445 F.Supp. 1203, 1207 (D.N.J. 1978). Second, the Section was represented by the office of the United States Attorney at the temporary restraining order hearing in September and did not then object to venue. We deem this non-opposition a waiver of any defense of improper venue.

The FPR requires that the twelve percent differential *shall* be applied when the low domestic bidder is a labor surplus area concern. The Section clearly has an implied duty to determine whether the low domestic bidder is a labor surplus area concern especially when its attention is called to a colorable allegation of an incorrect application of the six percent differential. In the latter circumstance, the Section must make some reasonable effort to gather sufficient information to substantiate its decision. Upon receiving Allis-Chalmers' telegram, the Section made no effort whatsoever to determine the validity of the allegations contained therein and thus arbitrarily refused to fulfill its regulatory duties.

This is not an instance in which we are improperly substituting our judgment for that of an agency as proscribed by *Sea-Land Service, Inc. v. Brown, supra,* 600 F.2d 429, 435 (3d Cir. 1979). Rather, it is a matter of the agency refusing to make a judgment it is obligated by regulation to make. We hold therefore that the Section's conduct in refusing to review the allegations of Allis-Chalmers regarding its status as a labor surplus area concern constituted a clear illegality.[4]

Were this the only issue facing us at this time, we would certainly enjoin the performance of the contract by Hitachi pending a proper evaluation of the labor surplus area status of Allis-Chalmers. We are dealing, however, with the further question about application of the differential to various parts of the lump sum bid. If we find that the differential, whether six or twelve percent, was properly applied to Hitachi's bid price less items 17 and 18, we need not decide how to resolve the labor surplus area issue.

## V. APPLICATION OF THE BUY–AMERICAN DIFFERENTIAL

As much as we would prefer to see an American concern performing a government contract, we are constrained to act within the statutory and regulatory framework through which the government may award procurement contracts. Our power is limited to reviewing the application of statutes and regulations promulgated by the other branches of federal government. The review simply determines whether such an application comports with the governing language. Arguments that particular interpretations of the law would lead to undesirable results may be made but are not persuasive in the face of the language of the Act, the Executive Order, and the FPR.

■ Allis-Chalmers advances the argument that bifurcation of a bid before application of the differential would invite unbalanced bidding. Because it alleges no such unbalanced bidding by Hitachi or the other foreign bidders, we presume that Allis-Chalmers is speculating about potential future abuse of the bidding process. We believe, however, that any government agency must reject materially unbalanced bidding as fraudulent. *See In re Allis-Chalmers Corporation, supra,* B–195311, p. 9 (Dec. 7, 1979); *Edward B. Friel, Inc.,* 55 Comp.Gen. 231 (1975). We also have faith in the ability of the responsible members of an agency to detect materially unbalanced bids by comparing all of the submitted bids and its own estimates.

We also agree with the Comptroller General that the unique size of hydro-turbines should not alter the application of the differentials. Allis-Chalmers insists that because the turbines cannot physically be totally manufactured and transported to the delivery point of Del Rio, Texas, the final assembly of the parts is not merely installation, but is actual manufacturing. As part of the manufacturing process, Plaintiff argues, the work done at damsite should have the differential applied to it. The important consideration, however, is the delivery to Del Rio, Texas. The sub-assemblies delivered there are the end products to which the differential must be applied. *See In re Allis-Chalmers Corporation, supra,* B–195311, pp. 8–9 (Dec. 7, 1979). The unique size of the turbines necessitates that particular interpretation of the regulations.

---

4. We note that our holding here concurs with that of the GAO. *In re Allis-Chalmers Corpo-* ration, *supra,* B–195311, pp. 10–11 (Dec. 7, 1979).

■ We must be primarily concerned, of course, with the accurate interpretation of the Buy-American language, both statutory and regulatory. Allis-Chalmers ascribes particular significance to the clause in the Executive Order 10582 that defines bid or offered price of materials of a foreign corporation as "the bid or offered price of such materials delivered at the place specified in the invitation to bid *including* applicable duty *and all costs incurred after arrival in the United States.*" Executive Order 10582 § 1(c). (Emphasis by Allis-Chalmers.) Allis-Chalmers looks at the emphasized phrase as requiring that the differential be applied to the entire bid. We disagree.

Allis-Chalmers ignores the first part of the definition defining the bid or price as that of the materials "delivered at the place specified in the invitation". Considering the entire clause, plus the requirement of applying a differential to all foreign bids, we interpret it as requiring application of the differential to all costs incurred in manufacturing and presenting the materials to the point of delivery. As mentioned above, the point of delivery is Del Rio, Texas, and the Section properly limited the application of the differential to the bid price of Hitachi for delivering the turbines to Del Rio. Items 17 and 18 are bid prices for services and installation *after* delivery of the turbines and the differential may not be applied to them.

We may also point to a section of the FPR supporting the Section's approach to application of the differential. Section 1–6.104–4(b) provides:

> When more than one line item is offered in response to an invitation for bids or request for proposals, the appropriate factor shall be applied on an item-by-item basis, except that *the factor may be applied to any group of items as to which the invitation for bids* or request for proposals *specifically provides that award is to be made on a particular group of items.* (Emphasis added.)

The line items to which the invitation for bids clearly provided for application of the differential are items 1 through 16. General Conditions 3.2 and 3.3 in the invitation for bids indicate specifically that the differential was to be applied to the parts of the turbine delivered to Del Rio, Texas. The bid amounts for Service and Erecting Engineers after delivery are expressly exempted from the Buy American Act differential by the GC–3.3. Allis-Chalmers' claim that it was unaware of the full meaning of that General Condition is both unfortunate and immaterial. By an analysis of the FPR and the General Conditions, it is clear to us that the Section was virtually required to deduct items 17 and 18 from Hitachi's lump sum bid before applying the differential.

■ Although the preceding discussion indicates our preliminary opinion regarding the ultimate propriety of the Section's application of the differential, we need make no final determination. The standard of review with which we must approach this case is the *Sea-Land* "clear illegality" test. We may grant a preliminary injunction halting the performance of this procurement contract only if the Section's application of the differential was clearly illegal. Allis-Chalmers unquestionably fails to satisfy this burden. It may very well be that Hitachi would have had a claim of clear illegality had the Section applied the differential to the entire bid. *See In re Fairbanks, Morse & Company*, 41 Comp.Gen. 70 (1961) (letter of transmittal). We hold, therefore, that the elimination of Items 17 and 18 from the Hitachi bid before application of the Buy-American differential is not clearly illegal.

Our opinion for much of this issue parallels the decision of the GAO to deny Allis-Chalmers' protest of this contract. *See In re Allis-Chalmers Corporation, supra*, B–195311, pp. 4–10 (Dec. 7, 1979). The GAO's final decision concluded:

> [T]he language of the Act, the E.O. and the FPR does not prohibit the exclusion of installation costs and other services incurred or provided after delivery to the Government of the end product before application of the Buy American differential.

*Allis-Chalmers, supra*, pp. 6–7.[5] Although we are certainly not obliged to follow the GAO's decision in this or any other matter, we are entitled to accord it substantial deference in our deliberations. *See, e. g., Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 106, 99 S.Ct. 1601, 1611, 60 L.Ed.2d 66, 81 (1979); *Sea-Land Service, Inc. v. Brown, supra*, 600 F.2d 429, 434 (3d Cir. 1979).[6]

The GAO opinion is further strengthened in our mind by the longevity of its controlling precedent, *In re Fairbanks, Morse & Company, supra*, 41 Comp.Gen. 70 (1961). It is a basic rule of construction that a long-standing interpretation of statutory or regulatory requirements by the agency charged with administering them is entitled to great weight when the statute or regulations come under judicial review. *See, e. g., Red Lion Broadcasting Company v. Federal Communications Commission*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Commissioner of Internal Revenue v. First Security Bank of Utah, N.A.*, 405 U.S. 394, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972). For eighteen years the Comptroller General's opinion in *Fairbanks, Morse* has stood without legislative or administrative alteration of the regulations on which it was based. The Comptroller General interpreted the Buy-American requirements in *Fairbanks, Morse* in a dispute very similar to Allis-Chalmers' protest. He concluded that the differential should be applied only to the part of the bid of a foreign corporation to deliver some hydro-turbines to the point of delivery. The bids for engineering and installation of the turbines should not be included in the Buy-American computations. The continued and recent reaffirmation by the Comptroller General of *Fairbanks, Morse* in *Allis-Chalmers* and other opinions indicates satisfaction in both Congress and the procuring agencies with the contested interpretation of the Buy-American requirements.

In the course of our preceding analysis of the application of the Buy-American differential, we continually considered an important aspect of the underlying policy of the Act: Protection of American labor and business from cheap foreign labor. Consistent with that policy it is natural to apply the differential only to the hydro-turbine sub-assemblies delivered to Del Rio. From that point in the performance of the contract, the engineering and installation bid prices, largely labor costs, are performed by American labor. We see no basis in the policy of the Act to apply the differential to the services performed after delivery of the turbines when those services are a discreet item in the bidding and are performed entirely by American labor.

Along similar policy lines we reject the argument advanced by Allis-Chalmers in its petition to the GAO for reconsideration of the December 7, 1979 opinion. Allis-Chalmers states that the GAO decision "permits foreign bidders to control the amount of work, and thus the costs, to which the Buy American Act differential applies." This control would presumably occur by leaving some of the assembly and other costs to be performed after delivery in the United States. This work would then be done by American labor. The GAO position in this matter could conceivably lead to *greater* use of American labor by foreign corporations.

We realize, of course, that this result may be effectively negated by other GAO decisions requiring, when possible, that a completed unit be delivered as the end product to which the differential is to be applied. *In re Fairbanks, Morse & Company, supra*, 48 Comp.Gen. 384 (1968); *In re Veterans'*

---

**5.** Each party's brief cited and relied upon various decisions by the Comptroller General in past applications of the Buy-American differential. Because we believe that the GAO decision in *Allis-Chalmers* accurately summarizes and analyzes the applicable Comptroller General precedents, we regard *Allis-Chalmers* as presenting the definitive GAO opinion on this issue and will not refer to prior decisions.

**6.** Although not binding on our decision to give weight to the GAO opinion, we note that counsel for Allis-Chalmers urged in open court that we should wait for the GAO opinion to resolve any questions we may have had. T–107.

*Administration*, 46 Comp.Gen. 813 (1967). But when, as here, a single, completed unit cannot be delivered as the end product, we see no conflicts with the underlying policy of the Act.

## VI.   *CONCLUSION*

The Section incorrectly applied the six percent Buy-American differential to the Hitachi bid without sufficient background information.   We do not hold that the twelve percent differential should have been applied, but merely suggest that the Section should have elicited and considered more information about the labor surplus status of Allis-Chalmers.

We conclude, however, that the section correctly bifurcated the total lump bid of Hitachi and properly declined to apply the differential to Items 17 and 18 of the bid. The Buy American Act differential should only be applied to the bid prices of the turbine sub-assemblies delivered to the railsite at Del Rio, Texas.

Because Allis-Chalmers needed to convince us of the clear illegality of both of the above decisions of the Section, but only succeeded with one, we denied its request for a preliminary injunction by our order dated December 7, 1979.