635 F.2d 248
 2 ITRD 1647, 58 A.L.R.Fed. 296, 28
Cont.Cas.Fed. (CCH) 80,960
 ALLIS-CHALMERS CORPORATION, HYDRO-TURBINE DIVISION, Appellant,
and
Local Union 1400, International Association of Machinists
and Aerospace Workers, AFL-CIO, Intervenor Plaintiff,
v.
FRIEDKIN, Joseph F., Commissioner, United States
Commissioner, International Boundary and Water Commission,
U.S. Section; The United States Section of the International
Boundary and Water Commission, Appellees,
Hitachi America, Ltd., 100 California St., San Francisco, CA
94111 (415) 981-7871 and South Texas Electric
Cooperative, Inc. and Medina Electric
Cooperative, Inc., Intervening
Defendants.
 Nos. 80-1144, 80-1230.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 16, 1980.
Decided Dec. 16, 1980.
 
 Thomas Schmutz (argued), Fred F. Fielding, Loren K. Olson, Washington, D. C., William J. Flannery, Harrisburg, Pa., William P. Schuster, West Allis, Wis., Morgan, Lewis & Bockius, Washington, D. C., for appellant.
 Eloise E. Davies (argued), Leonard Schaitman, Washington, D. C., Carlon M. O'Malley, Jr., U. S. Atty., Scranton, Pa., Alice Daniel, Washington, D. C., for Federal appellees.
 Lewis S. Kunkel, Jr. (argued), Pepper, Hamilton & Scheetz, Harrisburg, Pa., Edward K. Allison, San Francisco, Cal., David Colker, San Bruno, Cal., Graham & James, San Francisco, Cal., for Hitachi America, Ltd.
 James L. Cowden, Jerome H. Gerber, Handler & Gerber, P. C., for Local Union 1400.
 Lawrence B. Abrams, Harrisburg, Pa., for South Texas Elec. Cooperative, Inc.
 Morgan Hunter, McGinnis, Lochridge & Kilgore, Austin, Tex., Rhoads, Sinon & Hendershot, Harrisburg, Pa., for South Texas Elec. Cooperative, Inc. and Medina Elec. Coop.
 Before ADAMS, HUNTER and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge.
 
 
 1
 This action concerns whether a contract for the construction of the hydroelectric power plant at the Amistad damsite on the Rio Grande River[1] was awarded to defendant-intervenor Hitachi America, Ltd. in violation of the Buy American Act (hereinafter the "Act").[2] Allis-Chalmers, an unsuccessful participant in the contract bidding, contends that the Buy American Act was not correctly applied to Hitachi's bid. Specifically it has two claims; one, that the cost of installation and other post-delivery services were subject to the Act's surcharge, and two that a greater surcharge rate should have been applied to the foreign bid. If both of these adjustments were made to Hitachi's bid, Allis-Chalmers asserts they submitted the lowest bid and therefore the contract was awarded to Hitachi America unjustly.
 
 
 2
 We uphold the award of the contract to Hitachi America as within the discretion of the government purchasing agent and find that in the context of hydroelectric turbines the cost of installation and other post-delivery expenses should not be subject to the Buy American Act's surcharge. We therefore affirm the district court's denial of appellant's motion for preliminary injunction and sustain the grant of summary judgment in favor of appellees.
 
 I. FACTUAL SETTING
 
 3
 A. The Bidding Process.
 
 
 4
 The contract for the construction of the Amistad power plant involves the procurement of two massive hydroelectric turbines used to generate electricity.[3] The purchasing agent for the government was the United States Section of the International Boundary and Water Commission (hereinafter the "Section"). The Section retained the Army Corps of Engineers (hereinafter the "Corps") to orchestrate the contract bidding process and serve as its engineering representative for the project. Traditionally, the Corps solicits offers for the turbines from one manufacturer while a general contractor, retained under a separate bidding process, installs the turbines and builds the power plant. In the Amistad project these two segments-manufacture of the turbines and installation at the power plant-were contained in a single bid solicitation.[4] Under this combined system, one company bids on both stages, and the success of its bid depends on the combined price. The two stages, manufacture and installation, are separate line items within the bid, but each company bids on both even if it is not a general contractor.
 
 
 5
 In response to this bid solicitation, the sole domestic bidder, Allis-Chalmers, submitted an unadjusted bid of $4,005,800. The lowest foreign bidder, Hitachi America, Ltd., submitted an unadjusted bid of $3,400,000. These lump sum figures were then modified to reflect any applicable discounts and surcharges. The Corps deducted $38,070.50 (prompt payment discount) and $198,750 (testing) from Allis-Chalmers' bid.[5] Consequently, its final adjusted bid was $3,768,979.50.
 
 
 6
 As a foreign manufacturer bidding on a government contract Hitachi America's bid was subject to the Buy American Act and its implementary regulations.[6] The statute provides that American made articles and supplies be preferred in government construction contracts "unless the head of the department or independent establishment concerned shall determine it to be inconsistent with the public interest, or the cost to be unreasonable...." 41 U.S.C. § 10a (1976). As interpreted by the federal procurement regulations, the price of domestic goods is considered "unreasonable" and hence the Act's preference for domestic goods does not apply when their cost is six percent greater than that of foreign goods. 41 C.F.R. 1-6.104-4(b) (1979). Further, a twelve rather than six percent surcharge is taxed to the cost of foreign goods if the domestic bidder operates in an area of substantial unemployment ("labor surplus concern"). Id. After consulting with the United States Department of Labor, the Corps found that Allis-Chalmers' manufacturing plant in York, Pennsylvania, was in an area of substantial unemployment making Allis-Chalmers a labor surplus concern and therefore applied the twelve percent Buy American surcharge to Hitachi's bid. The Corps subtracted the cost of installing the turbines ($983,800) and the services of an erecting engineer ($15,750) from HITACHI'S BID AND THEN APPLIED THE TWELVE pErcent surcharge to the balance. the cost of installation and engineering services were then added back into the total price as well as an additional $60,000 for foreign inspections. This made Hitachi's final adjusted bid $3,748,054, or approximately $20,000 less than Allis-Chalmers'.
 
 B. The Procedural History
 
 7
 On June 18, 1979 the Corps informed Allis-Chalmers that the cost of installation and engineering services would be excluded from the amount of Hitachi's bid that was subject to the Act's surcharge. The Section then reviewed the Corps' recommendation that the contract be awarded to Hitachi and upon independent examination concluded that the six percent rather than twelve percent surcharge should have been imposed on Hitachi's bid. The Section found that the East Berlin plant of Allis-Chalmers was located, not in the City of York, but rather in nearby Manchester Township which is not an area of substantial unemployment.[7]
 
 
 8
 In light of these findings Allis-Chalmers protested the anticipated award of the contract to the Corps and the Comptroller General of the General Accounting Office (hereinafter "GAO"). It asked that no final action be taken on the contract until its protest was resolved. On September 9, 1979 the Section informed the GAO of its decision to award the contract to Hitachi notwithstanding Allis-Chalmers' protest. After reviewing the contract and the bid solicitation, the Comptroller General denied Allis-Chalmers' protest and upheld the award of the contract to Hitachi. In re Allis-Chalmers Corporation, B-195311 (Dec. 7, 1979) (Opinion of the Comptroller General).
 
 
 9
 Allis-Chalmers sought a temporary restraining order and a preliminary injunction in the United States District Court for the Middle District of Pennsylvania to enjoin the Section's award of the contract to Hitachi. On September 28, 1979, Hitachi moved to intervene as defendant with the Section. The court granted this motion and permitted South Texas and Medina Electric, two privately owned electrical cooperatives which had contracted to purchase the electricity generated by the project, to intervene as defendants. The court also allowed Local Union, 1400, International Association of Machinists and Aerospace Workers, AFL-CIO, the union at Allis-Chalmers' East Berlin plant, to intervene as plaintiffs. After a hearing on this issue the district court granted a restraining order staying the award of the contract until Allis-Chalmers' protest was resolved. The TRO was then extended until December 7, 1979 when the district court ruled against Allis-Chalmers on the merits and awarded the contract to Hitachi. Allis-Chalmers Corp. v. Friedkin, 481 F.Supp. 1256 (M.D.Pa.1980).
 
 
 10
 The two prongs of Allis-Chalmers' complaint have remained consistent throughout the administrative hearings and earlier litigation; one, the Corps erred in not applying the Buy American surcharge to the installation and engineering services portion of Hitachi's bid; and two, contrary to the Section's discussion, the twelve percent surcharge rate is applicable to Hitachi's bid. Allis-Chalmers must succeed on both of these claims if it is to have the lowest bid and hence the contract. A six percent differential applied to the entire bid of Hitachi or a twelve percent differential applied without the cost of installation and engineering services included in the bid would be insufficient to make Allis-Chalmers' adjusted bid lower than Hitachi's.
 
 
 11
 II. APPLICATION OF THE BUY AMERICAN ACT SURCHARGE.
 
 
 12
 Our review of the agency's purchasing decision-including its interpretation of the procurement regulations-is quite limited. Judicial intrusion into government purchases necessarily delays completion of the contract and increases costs, with little measurable benefit to the public. We recognized this problem in Sea-Land Service, Inc. v. Brown, 600 F.2d 429, 435 (3d Cir. 1979), and stated that a court should not substitute its judgment for that of the contracting agency. Rather the court should determine whether the procurement decision was a rational one; if so the agency's decision must be upheld.
 
 
 13
 While courts do have an obligation to ensure agency compliance with the applicable statutes and regulations, several factors enter into the analysis. As we noted in Sea-Land :
 
 
 14
 When jurisdiction is exercised in the field of governmental procurement, there are three interests that must be weighed: the practical considerations of efficient procurement of supplies for continuing government operations; the public interest in avoiding excessive costs; and the bidder's entitlement to fair treatment through adherence to statutes and regulations.... A showing of clear illegality is an appropriate standard to impose on an aggrieved bidder who seeks relief.
 
 
 15
 Id. at 434. See also M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C.Cir.1971) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition have reached a different conclusion as to the proper administration and application of the procurement regulations.")
 
 
 16
 12. Applying the first criterion of Sea-Land -the practical considerations for the efficient procurement of supplies-we note initially, that any delay in the award or performance of the contract will necessarily delay the completion of the entire project. Delay in the completion of the plant will result in an increase in the consumption of finite energy resources while forcing the consumers to pay higher rates required by the greater cost of non-hydroelectric power.[8] This factor supports the affirmance of the Corps' contract award so that further delay in the construction of the hydroelectric plant, and the expense that entails, can be minimized.
 
 
 17
 The second criterion-public interest in avoiding excessive costs-also militates toward affirming the award of the contract to Hitachi. Government contracts are awarded under a competitive bidding process to reward the most cost efficient manufacture and thereby save public funds. Hitachi's unadjusted bid was almost one million dollars less than Allis-Chalmers'. Even after adjustments that included a twelve percent surcharge on portions of Hitachi's bid, Allis-Chalmers' proposal still exceeded Hitachi's by approximately $20,000. Public funds would be saved by awarding the contract to Hitachi.
 
 
 18
 The third criterion-the bidder's entitlement to fair treatment through agency adherence to statutes and regulations-is most important for our analysis and the primary focus of Allis-Chalmers' complaint. Because we hold that the cost of installation at the damsite and the services of an erecting engineer were properly excluded from the Act's Surcharge, we do not reach the issue of the surcharge rate and therefore uphold the Section's award of the contract to Hitachi.
 
 
 19
 Allis-Chalmers challenges Hitachi's treatment under the Act on several grounds. Initially, appellants claim that both the Executive Order and the regulations implementing the Buy American Act, require that once a bid is determined to be "foreign" the entire bid price is subject to the Act.[9] Therefore all of Hitachi's bid, including installation and engineering, should have been subject to the surcharge.
 
 
 20
 As support for this interpretation, appellant cites section 2(b) of the Executive Order which provides that the "bid or offered price" of foreign materials is subject to the Act's surcharge.[10] The phrase "bid or offered price" is then defined by section 1(c) of the Executive Order to be the "price of such materials delivered at the place specified in the invitation for bid including applicable duty and all costs incurred after arrival into the United States."[11] Thus according to Allis-Chalmers, once a bid is classified as foreign, section 2(b) applies the Act's surcharge to the entire bid or offered price which section 1(c) defines as "all costs incurred after arrival into the United States."
 
 
 21
 Allis-Chalmers also relies on the federal procurement regulations that require all foreign bids to be adjusted by a surcharge.[12] These regulations define a foreign bid as the "bid or offered price for a foreign end product,"[13] and end products are defined as items "to be delivered to the government, as specified in the contract...."[14] Hence, appellant contends that because turbines are a foreign end product under the contract their costs must be adjusted by the surcharges.
 
 
 22
 We cannot accept this interpretation. To apply the surcharge automatically to the entire price of a foreign bid once it is determined that the bid is foreign, ignores the implementary regulation that requires the surcharge to be applied to a foreign bid on a line-by-line basis. Specifically 41 C.F.R. § 1-6.104-4(b) directs the procuring agency to parse the foreign bid into taxable and non-taxable segments. It states in part:
 
 
 23
 When more than one line item is offered in response to an invitation for bids or request for proposals, the appropriate factor shall be applied on an item-byitem basis, except that the factor may be applied to any group of items as to which the invitation for bids or request for proposals specifically provides that award is to be made on a particular group of items.
 
 
 24
 This provision undercuts Allis-Chalmers contention that once a bid is determined to be foreign the entire total is subject to the Act's surcharge.
 
 
 25
 Additionally, as the Section argues, the Executive Order and implementary regulations do not subject the entire bid to the Act's surcharge but rather exclude all post-delivery expenses. Specifically section 1(c) of the Executive Order states that the "bid or offered price of foreign origin means the bid or offered price of such materials delivered at the place specified in the invitation for bid...." This reference to the delivered price is reinforced by the definition of end products contained in 41 C.F.R. § 1-6.101(a): "As to a given contract, the end products are the items to be delivered to the government, as specified in the contract...."
 
 
 26
 The focal point of this interpretation is the determination of when materials are "delivered" under the contract; if costs occur before delivery they are subject to the surcharge, if they are incurred after delivery they are exempt. The expenses of an erecting engineer and installation occur after delivery and therefore are exempt from the surcharge. "Delivered" is defined by the invitation for bids to mean F.O.B. railroad cars, Del Rio, Texas. In re Allis-Chalmers Corporation, B-195311 at 3 (Dec. 7, 1979) (Decision of Comptroller General). Appellants contend that an end product is not delivered under the contract until it is completely assembled and operational. We refuse to accept this and find instead that the turbine sub-assemblies were delivered, as the invitation for bids states, when they arrived F.O.B. at Del Rio, Texas.
 
 
 27
 Under the strict standard of review set out by this court in Sea-Land we cannot hold the Section's construction of the federal procurement regulation to be "clearly illegal." Sea-Land, 600 F.2d at 3450. Indeed, the Corps' invitation for bids underscores the Section's construction of the Act. General Conditions 3.2 and 3.3 of the invitation for bid stated:
 
 
 28
 3.2 End Products are the items to be delivered to the Government, as specified in the contract, including supplies to be acquired by the Government for public use in connection with service contracts, but excluding installation and other services to be performed after delivery.
 
 
 29
 3.3 When the services of erecting engineers are specified in the bid amount in the Schedule for Services of Erecting Engineers will be subtracted (sic) from the bid amount before application of the Buy American Act.
 
 
 30
 General Conditions 3.2 and 3.3 (emphasis added). See Allis-Chalmers, 481 F.Supp. 1256, 1260 (M.D.Pa.1980). The conditions of the bid solicitation, gave bidders notice of how the Section would interpret the Act. While such statements are not a binding construction of the procurement regulations, they do evidence a consistency of treatment throughout the bidding process and add support to the Section's construction of the regulations.
 
 
 31
 Finally we consider it important that the Comptroller General has addressed this precise issue and excluded installation and other post-delivery expenses from the Act's surcharge. In Re Allis-Chalmers, B-195311, (Dec. 7, 1979) (Decision of the Comptroller General). While his opinion is not controlling as a matter of law, it is material to our decision. Wheelabrator Corporation v. Chafee, 455 F.2d 1306, 1313 (D.C.Cir.1971). Cf. Gladstone, Realtor v. Village of Bellwood, 441 U.S. 91, 105-06 n.15, 99 S.Ct. 1601, 1611, 60 L.Ed.2d 66 (1979) (non-judicial relief for housing violations described as more expeditious and less burdensome method of resolving housing complaints). In this case the Comptroller General affirmed the Section's interpretation of the Act and award of the contract to Hitachi. His opinion stated "(T)he Act, the E.O. and F.P.R. (do) not prohibit the exclusion of installation costs and other services incurred or provided after delivery to the government of the end product before application of the Buy American Act differential." In re Allis-Chalmers Corporation, B-195311 at 6-7.
 
 
 32
 This exclusion of post-delivery expenses is consistent with earlier constructions of the Act by Comptroller General. In Westinghouse Electric Corporation, 53 Comp.Gen. 259, 261-62 (1973), appellant argued that the services of an installation engineer were part of the end product and hence not subject to the Act's surcharge. The Comptroller General disagreed:
 
 
 33
 We are inclined to the view that under the provisions of the Buy America Act, as implemented by Executive Order No. 10582 and FPR 1-6.2, computation of the differential should be based on the cost of the foreign supplies or materials delivered at destination, and that additional costs involved in installation or other services to be performed after delivery should be excluded from the computation.
 
 
 34
 Id. at 261 (quoting from a transmittal letter to the Secretary of the Interior involving Fairbanks Morse & Company). Thus the Comptroller's application of the Act's surcharge to the delivered cost of Hitachi's turbines conformed with prior interpretations of the Act's scope.
 
 
 35
 Allis-Chalmers also contends that "end products" in this case means two fully assembled hydroelectric turbines that have been installed into the power plant. If the turbines in this contract had not been so large, appellant contends, they would have been shipped completely assembled from the point of foreign manufacture, and the Act's surcharge would have applied to the entire bid price. Allis-Chalmers claims that Hitachi should not be treated differently under the Act simply because the size of the turbines requires the shipment of unassembled parts with final assembly performed at the damsite. It is error, appellant argues, to speak of an unassembled turbine as an "end product" when the contract calls for two functioning hydroelectric generators. Hence, the final assembly of the turbines at the damsite is not installation at all but rather the final stage of manufacturing and the Act's surcharge should apply to this activity.
 
 
 36
 We find this logic unpersuasive, as did the Comptroller General. While shipping constraints may cause the hydroelectric turbines to be delivered in sections, the sum of these pieces is not a collection of useless parts, but rather the materials that comprise a functioning turbine. As the Comptroller General emphasized, it is not possible to install a large turbine or generator as a fully assembled unit.[15] The assembly/installation of the various sections of a turbine must be done in stages as the construction of the powerhouse progresses. Hence Hitachi's installation/final assembly cost is excluded from the Act's surcharge not because the size of the turbine required unassembled shipping, but rather because the various stages of powerhouse construction dictate the delivery of disassembled turbine parts.
 
 
 37
 As noted earlier, the Corps has historically awarded separate contracts for the manufacture of the turbines and the installation of these turbines during the powerhouse construction. The Corps' decision to combine the two stages into a contract for the Amistad damsite is no reason to blur the distinction between manufacturing, which is subject to the Act's surcharge and installation which is not.[16]
 
 
 38
 Finally, Allis-Chalmers contends that limiting the Act's surcharge to cost of foreign goods will encourage unbalanced bidding. Unbalanced bidding occurs when companies use foreign manufactured goods and materials that are subject to the surcharge, but then perform the bulk of manufacturing on these materials in the United States to minimize the impact of the Act's surcharge. This type of unbalanced bidding, it is contended, undercuts the protection afforded American labor by the Buy American Act.
 
 
 39
 This analysis presents several problems. First, while unbalanced bidding may exist, there is no indication that Hitachi's bid was unbalanced. Second, we believe that materially unbalanced bids can be detected and adjusted by the procuring agency. Finally, we fail to appreciate the problem of "unbalanced" bidding. The central purpose of the Buy American Act was to protect the American worker.[17] If the foreign firms make their bids unbalanced by performing a disproportionate amount of manufacturing at the American jobsite, then the purpose of the Buy American Act-protection of the American worker-has been largely achieved. Foreign firms will employ American workers to perform the assembly/installation on the domestic jobsite and minimize their foreign manufacturing subject to the Act's surcharge. The Buy American Act protects American labor, not specific employers who seek contracts. To the extent firms submit "unbalanced" bids by having the majority of the work performed on the domestic jobsite with a minimum of the bid subject to the Act's surcharge the Buy American Act has served its purpose-American workers perform the jobsite manufacturing and the cost of foreign goods and materials is subject to the Act's surcharge.
 
 
 40
 We find therefore that the Section's award of the contract to Hitachi America was not clearly illegal and we affirm the judgment of the district court.
 
 
 41
 ADAMS, Circuit Judge, concurring.
 
 
 42
 While I concur in the result reached by the majority, I write to emphasize that our decision today is virtually ordained by the principle that the judiciary is required to accord substantial deference to the opinion of the administrative body charged with interpreting and applying a set of statutory and regulatory requirements. See United States v. National Association of Securities Dealers, 422 U.S. 694, 718-19, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975); Investment Co. Institute v. Camp, 401 U.S. 617, 626-27, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971). At least as early as 1973, the Comptroller General concluded that when the Government seeks to procure items that will not be assembled until after delivery at the jobsite, that portion of the bid of a foreign corporation attributable to on-site assembly and installation costs is not subject to the differential provided by the Buy America Act. Westinghouse Electric Corp., 53 Comp.Gen. 259 (1973). The Comptroller General has not retreated from this interpretation of the statute, as illustrated by his application of the principles of Westinghouse Electric to the present case. See In re Allis-Chalmers, B-195311 (Dec. 17, 1979).
 
 
 43
 Were it not for this line of precedent from the Comptroller General, I would have considerable difficulty holding that the contract in the present case was properly awarded to Hitachi. The legislative history of the Buy American Act suggests that at least some of its supporters intended to include within the sweep of the Act products whose parts were manufactured abroad and then assembled in the United States. When the Act was debated on the floor of the Senate, an amendment was proposed that would have exempted from the Act's coverage "articles of the growth, production, and/or manufacture of the United States." Senator Johnson, the sponsor of the Act, objected to the proffered amendment on the following grounds:
 
 
 44
 From my standpoint, the vice of this amendment is that from outside, from a foreign country, could be brought into this country the material which could be manufactured as seen fit, and then it would not be within the prohibition of the law.
 
 
 45
 For instance, as I have repeatedly stated upon the floor, the impelling cause of this measure was the situation at the Boulder Dam, where it was expected that the lowest bid would be from Germany for the turbines or generating machinery and the like-a transaction involving about $6,000,000. Now, assume that they brought over from Germany part of the machinery, and assume that they brought over then in another ship another part of it, and in another ship another part of it, and then, in some factory in this country, it was assembled and manufactured. Then, there would be no prohibition upon it such as I desire to put in this bill upon bids of that sort.
 
 
 46
 76 Cong.Rec. 3267 (Feb. 3, 1933). It is troubling, to say the least, that the situation sought to be protected against by the sponsor of the Buy American Act-the production abroad of parts for hydro-turbines which would later be assembled in the United States-is now asserted to be outside the ambit of the Act's provisions.
 
 
 47
 As the majority points out, the legislative history also reflects a concern for the protection of American workers. I am not so confident as the majority, however, that the award of the contract to Hitachi will have no effect on American labor. There is no indication in the record that American engineers and technicians will be employed for the installation of the hydroturbines in the same numbers in which they would have been employed had the contract been awarded to Allis-Chalmers. To the extent that they are replaced with foreign technical experts, American labor will have been displaced.
 
 
 48
 The Comptroller General's interpretation of the Act and the attendant award of the contract to Hitachi are not, in this case, so "clearly illegal"-the standard set forth in Sea-Land Service, Inc. v. Brown, 600 F.2d 429, 435 (3d Cir. 1979)-that they should be overturned by this Court. But I have serious doubts whether the interpretation of the Comptroller General is the one that comports best with the underlying purposes of the Buy American Act.
 
 
 
 [1]
 On November 14, 1944 the United States and Mexico signed a treaty which authorized construction of two hydroelectric dams on the Rio Grande River. Treaty Relating to the Utilization of Waters of the Colorado and Tijuana Rivers and of the Rio Grande, Nov. 14, 1944, United States-Mexico, 59 Stat. 1219, T.S. No. 944. A second hydroelectric power plant was also constructed on the Rio Grande, at the Falcon damsite, but that project is not included in this action
 
 
 [2]
 41 U.S.C. §§ 10a-10d (1976). President Eisenhower supplemented the statute with Executive Order No. 10582, 19 Fed.Reg. 8,723 (1954), reprinted in, 41 U.S.C. § 10d at 1331-32 (1976), in order to ensure uniform application of the Buy American Act. The Act was refined further by federal procurement regulations located at 41 C.F.R. §§ 1-6.100-2.01 (1979)
 Passed at the height of the depression, the Buy American Act requires the use of American made articles, materials, and supplies in government construction contracts, unless such use is inconsistent with the public interest or the government purchasing agent determines the cost of domestic supplies to be unreasonable. The federal procurement regulations declare the price of a domestic bid to be "unreasonable" if it is either six percent greater than the lowest foreign bid or, if the lowest American bidder is a small business concern or operates in an area of substantial unemployment, its bid is unreasonable if it is twelve percent above the lowest foreign bid. 41 C.F.R. § 1-6.104-4 (1980).
 
 
 [3]
 The great size of the hydroelectric turbines made shipment of a completed turbine unit impossible. Rather, the turbine sections were shipped to the damsite for assembly in conjunction with the construction of the powerhouse
 
 
 [4]
 This identical bidding format was used for the award of a hydroelectric turbine contract in the recent Libby Dam project at Seattle, Washington
 
 
 [5]
 In evaluating the submitted bids the bid solicitation authorized the Corps to deduct the cost of model turbine tests if the bidder had conducted such tests previously and submitted sufficient data to enable the contracting officer to judge the acceptability of the prior tests. This was done with Allis-Chalmers' bid and $198,750 was deducted
 
 
 [6]
 The Buy American Act provides in pertinent part:
 § 10a. American materials required for public use
 Notwithstanding any other provision of law, and unless the head of the department or independent establishment concerned shall determine it to be inconsistent with the public interest, or the cost to be unreasonable, only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States, and only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured, as the case may be, in the United States, shall be acquired for public use. This section shall not apply with respect to articles, materials, or supplies for use outside the United States, or if articles, materials, or supplies of the class or kind to be used or the articles, materials, or supplies from which they are manufactured are not mined, produced, or manufactured, as the case may be, in the United States in sufficient and reasonably available commercial quantities and of a satisfactory quality.
 § 10b. Contracts for public works; specification for use of American materials; blacklisting contractors violating requirements
 (a) Every contract for the construction, alteration, or repair of any public building or public work in the United States growing out of an appropriation heretofore made or hereafter to be made shall contain a provision that in the performance of the work the contractor, subcontractors, material men, or suppliers, shall use only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States, and only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured, as the case may be, in the United States except as provided in section 10a of this title: Provided, however, That if the head of the department or independent establishment making the contract shall find that in respect to some particular articles, materials, or supplies it is impracticable to make such requirement or that it would unreasonably increase the cost, an exception shall be noted in the specifications as to that particular article, material, or supply, and a public record made of the findings which justified the exception.
 (b) If the head of a department, bureau, agency, or independent establishment which has made any contract containing the provision required by subsection (a) of this section finds that in the performance of such contract there has been a failure to comply with such provisions, he shall make public his findings, including therein the name of the contractor obligated under such contract, and no other contract for the construction, alteration, or repair of any public building or public work in the United States or elsewhere shall be awarded to such contractor, subcontractors, material men, or suppliers with which such contractor is associated or affiliated, within a period of three years after such findings is made public.
 
 
 [7]
 In order to have the lowest bid for the turbines Allis-Chalmers must succeed in having the twelve percent surcharge rate applied to Hitachi's entire bid. Because we find that the cost of installation and the services of an erecting engineer should be exempt from the surcharge, we do not reach the question of whether the six or twelve percent differential should be applied
 
 
 [8]
 Mr. Thor Anderson, vice-president of the architectural firm that designed the Amistad project, testified that any delay in the award or performance of the hydroturbine contract would delay the completion of the entire contract. In addition, Mr. William Robinson, general manager of the defendant's electrical cooperative stated that delay in completion of the contract will unnecessarily drain this country's energy's reserves. Allis-Chalmers, 481 F.Supp. at 1264
 
 
 [9]
 A bid is "foreign" under the regulations implementing the Buy American Act if the end product that makes up the bid is a "foreign end product." 41 C.F.R. § 1-6.101(g) (1979). An end product is considered foreign if it is either: manufactured outside the United States; or the cost of the components of the end product which are manufactured other than in the United States amount to more than 50 percent of the cost of all components. 41 C.F.R. § 1-6.101(d) (1979)
 
 
 [10]
 Section 2(b) of Executive Order No. 10582 states in pertinent part:
 For the purposes of the (Buy American) Act the bid or offered price of materials of foreign origin shall be deemed unreasonable ... if the bid or offered price thereof exceeds the sum of the bid or offered price of like materials of foreign origin and a differential computed as provided in subsection (c) of this section.
 Executive Order No. 10582 § 2(b), reprinted in, 41 U.S.C. § 10d at 1331-32 (1976).
 
 
 [11]
 Section 1(c) of the Executive Order states:
 The term "bid or offered price of materials of foreign origin" means the bid or offered price of such materials delivered at the place specified in the invitation to bid including applicable duty and all costs incurred after arrival in the United States.
 Executive Order No. 10582 § 1(c), reprinted in 41 U.S.C. § 10d at 1331-32 (1976).
 The invitation for bids called for delivery of the turbines "F.O.B. railroad cars at Del Rio, Texas." In re Allis-Chalmers Corporation, B-195311 at 3 (Dec. 7, 1979) (Decision of Comptroller General).
 
 
 [12]
 Section 1-6.104-4(b) sets out in detail the procedures that must be followed by procuring agencies in applying the Act's surcharge
 (B)ids and proposals shall be evaluated as provided in this section so as to give preference to domestic bids. Each foreign bid shall be adjusted for purposes of evaluation by adding to the foreign bid (inclusive of duty) a factor of 6 percent of that bid, except that a 12 percent factor shall be used instead of the 6 percent factor if the firm submitting the low acceptable bid is a small business concern or a labor surplus area concern.
 
 
 [41]
 C.F.R. § 1-6.104-4(b) (1979)
 
 
 [13]
 Section 1-6.101(g) defines foreign bid as "a bid or offered price for a foreign end product, including transportation to destination, and duty (whether or not a duty free entry certificate may be issued). 41 C.F.R. § 1-6.101(g) (1979)
 
 
 [14]
 End products are defined by section 1-6.101(a) to be:
 (A)rticles, materials, and supplies which are to be acquired for public use. As to a given contract, the end products are the items to be delivered to the government, as specified in the contract, including articles, materials and supplies to be acquired by the government for public use in connection with service contracts.
 
 
 [41]
 C.F.R. § 1-6.101(a) (1979) (emphasis added)
 
 
 [15]
 In re Allis-Chalmers Corp., B-195311 at 9 (Dec. 7, 1979). We recognize that certain cases cited by Allis-Chalmers support the proposition that an end-product can be the fully assembled item, not just some of the components. See, e. g., Imperial Eastman Corp., 53 Comp.Gen. 726 (1974) (tool kits must be assembled to be an end product). The assembly discussed in these cases is not analogous to the installation/assembly of massive hydroelectric turbines into the powerhouse
 
 
 [16]
 The Comptroller General addressed this issue and stated:
 Where the procurement is conducted with two discrete contracts, (materials and installation) the manner in which the Buy American differential should be applied is obvious. The total of the unassembled subassemblies delivered to the government under the supply contract is the end product for that contract and the differential would apply to that. No differential would be applied to the bid price of the construction/assembly installation contract even though the contract resulted in the final assembled, functioning turbine or generator. We see no reason why this rationale should not be applicable when the awarded contract includes both stages discussed above.
 In re Allis-Chalmers, B-195311 (Dec. 7, 1979) (Decision of Comptroller General).
 
 
 [17]
 The legislative history of the Act is sparse and confusing: however, protection of the American worker is a dominant theme. See, e. g., Remarks of Senator Davis on the floor of the Senate typifies the legislator's concern that the American worker should benefit from the Act:
 The adoption of this amendment will mean work for our workers. It will help stem the tide of foreign competition and thus prevent further reduction of wages for the American worker.
 
 
 [76]
 Cong.Rec. 1933 (1933). But see 76 Cong.Rec. 3266-68 (1933) (Remarks of Senator Johnson)