**KEENE CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 81–573–JLL.**

United States District Court, D. Delaware.

April 19, 1984.

---

William J. Cattie, III of Heckler & Cattie, Wilmington, Del., and Jerold Oshinsky, Robert H. Shulman and Deborah A. Swindells of Anderson, Baker, Kill & Olick, Washington, D.C., of counsel, for plaintiff.

Joseph J. Farnan, Jr., U.S. Atty., and William C. Carpenter, Jr., Asst. U.S. Atty., Wilmington, Del., for defendant.

## OPINION

LATCHUM, Senior District Judge.

This case is presently before this Court on the parties' cross motions for summary judgment.[1] (Docket Item ["D.I."] 13, 16.) Pursuant to Fed.R.Civ.P. 56, the plaintiff, Keene Corporation ("Keene"), seeks an order permanently enjoining the United States from soliciting black and red silicone rubber tape as a small business set-aside procurement in violation of the Armed Services Procurement Act, 10 U.S.C. § 2301 (1976), the Small Business Act, 15 U.S.C. § 631 et seq. (1976), the Administrative Procedure Act, 5 U.S.C. §§ 702–706 (1976), and the Armed Services Procurement Regulations. (D.I. 1.) Keene also seeks an order declaring that the United States' decision to designate the procurement of red and black extruded self-adhering silicone

---

1. This Court has jurisdiction over this action by virtue of 28 U.S.C. § 1331 (1976).

rubber tape as a total small business set-aside was arbitrary, capricious, without a rational basis, an abuse of discretion and otherwise not in accordance with the law. (*Id.*)

## I. BACKGROUND

Plaintiff Keene is a corporation organized and existing under the laws of the State of New York, having its principal place of business in New York. (D.I. 1 at 1; D.I. 4 at 1.) It is the plaintiff's Chase Foster Division located at Bear, Delaware, that is principally involved in this dispute. (*Id.*) The Chase Foster Division employs approximately 150 people, 45 of which are involved in the production of teflon and silicone rubber products at Bear, Delaware. (D.I. 14 at 1.)

The defendant, United States of America ("United States"), acted by and through its officers, employees and agencies, specifically Casper Weinberger, Secretary of the Department of Defense ("DOD"), Vice Admiral Eugene A. Grinstead,[2] USN, Director of the Defense Logistics Agency ("DLA"), Glen D. Peck,[3] Contracting Officer at the Defense General Supply Center ("DGSC"), and J.S. Harvie,[4] Small and Disadvantaged Business Utilization Specialist for DGSC. (*Id.*).

The DLA, a branch of the United States Department of Defense, is charged with the supply and logistics functions of all of the branches of the Armed Services. (D.I. 19 at 1A.) Within the agency of the DLA, the DGSC has the responsibility of purchasing and furnishing supplies of a general nature to all of the branches of the Armed Services. (*Id.*) Within this responsibility, the contracting officer, employed by the DGSC, solicits bids for the procurement of extruded self-adhering silicone rubber tape in red and black colors.[5] (*Id.*)

The Chase Foster Division of Keene had been a major supplier to the DGSC of red and black extruded self-adhering silicone rubber tape until DGSC designated the procurement of the black tape as a total small business set-aside in late 1979 by a solicitation for bids issued on November 28, 1979. (D.I. 4 at 2.) DGSC designated the red tape as a total small business set-aside in late 1980. (D.I. 1 at 2; D.I. 4 at 2.)

## II. FACTS

The relevant and material facts are not in dispute and may be summarized as follows:

Prior to 1979, the contract for the delivery of electrical tape was provided to the lowest responsible responsive bidder. (D.I. 8 at 9.) Until November 1979, Keene had successfully bid and been awarded contracts to supply black and red electrical tape. (D.I. 1 at 4; D.I. 4 at 2.) However, in November 1979,[6] Keene was prohibited from bidding on the solicitation because the bid solicitation for the procurement of the black electrical tape was designated[7] a to-

---

**2.** Secretary Weinberger and Director Grinstead, in their official capacities, are charged with implementing and enforcing the laws of the United States, the regulations of the DOD and the regulations of the DLA. (D.I. 1 at 2; D.I. 4 at 1.) Secretary Weinberger and Director Grinstead, in their representative capacities, ultimately are responsible for the enforcement of the laws and regulations applicable to the actions of DOD and the DLA and for the actions challenged by the plaintiff. (*Id.*) The DOD and the DLA are duly constituted executive agencies of the United States. DOD and DLA are responsible for the actions challenged by the plaintiff. (*Id.*)

**3.** Glen D. Peck is responsible for procurement activities falling within the scope of his position as contracting officer and Chief, Electrical Supplies Large Purchase Section. (D.I. 4 at 1.)

**4.** J.S. Harvie is responsible for procurement activities falling within the scope of his position as Small and Disadvantaged Business Utilization Specialist at DGSC. (*Id.*)

**5.** Silicone rubber tape is an electrical tape that is used to insulate electrical connections in high temperature conditions. (D.I. 19 at 1A, 45A–47A.) The specifications of the electrical tape 5970–00–955–9976 (black) and 5970–00–949–4846 (red) are: 1-inch wide, .04 inches thick, in accordance with military specifications MIL–I–40852B, Type II. (*Id.* at 2A.)

**6.** Total set-aside for the black electrical tape was established on November 28, 1979. The total set-aside for the red electrical tape did not occur until November 10, 1980. *See* D.I. 19 at 12A, 13A, 25A.

**7.** Peck is the contracting officer of the DGSC, the office that solicits various commercial

tal small business set-aside [8] and thus the solicitation was restricted to small business concerns. (D.I. 19 at 12A, 13A.)

The last solicitation issued by the DGSC for black electrical tape (DLA 400–79–B–2610) which was not a total small business set-aside occurred on July 3, 1979. (D.I. 19 at 2A, 8A.)

On June 14, 1979, Peck made a recommendation to set-aside 50% of the quantity called for in the solicitation for labor surplus area concerns.[9] (D.I. 19 at 11A.) This decision was based on a review of the bids and offers received from the last procurement, dated April 1978, which showed that two large [10] and one small business manufacturer submitted bids within the competitive range. (*Id.*) The invitation for bids No. DLA 400–79–B–2610 was opened on August 2, 1979, and a total of six bids were received. (D.I. 19 at 8A–10A.) Two of the bids received were from small business manufacturers, Markel Corporation ("Markel") and Moxness Products, Inc. ("Moxness"). (*Id.* at 8A.) Since this was a 50% labor surplus area set-aside, the non-set-aside portion of the solicitation was awarded to Keene, as low bidder, at a price of $3.50 per roll for contract items 1 and 2, and $3.25 per roll for contract items 3 through 5. (*Id.* at 2A, 3A–10A, 66A.)

One small business manufacturer, Markel, took exception to the government's packaging requirements for Leeds & Northrup, a Navy depot in Oakland, California. (D.I. 7 at 9.) Therefore, the bid was initially determined to be non-responsive to the solicitation. (D.I. 7 at 9; D.I. 8 at 39, 40.)

The next solicitation for black insulation electrical tape for DLA 400–80–B–0065 was issued on November 28, 1979. (D.I. 19 at 3A, 12A.) Based upon his review of the two small business bids received on August 2, 1979, and the exception taken by Markel, Peck, on October 24, 1979, had recom-

items. (D.I. 8 at 3.) The DGSC receives requests submitted by the Army, the Navy, the Air Force, the Marines or the Coast Guard for a specific commodity. (*Id.* at 5.) Based on these demands or requirements the DLA, more specifically the DGSC, issues solicitations for bids on the various items. (*Id.*)

Peck supervises 11 buyers that issue the solicitations. (*Id.* at 3.) These buyers or purchasing agents receive the requests from the other organizations in the government for a specific item with a specific stock number. (*Id.* at 6.) The purchasing agent then prepares the solicitation, makes the evaluation on a worksheet, and submits the recommendations to the contracting officer. (*Id.*)

When the solicitation is opened, the bids that are received are evaluated for price, discount and delivery. (*Id.* at 9.) The DGSC then determines if the bids are responsive to the terms and conditions of the contract or the solicitation. (*Id.*) After the bids are determined to be responsive, the DGSC awards the contract to the lowest responsive bid. (*Id.*) However, if an exception is taken to a provision within the solicitation, the DGSC may contact the bidder to request a clarification or try to resolve the exception with the bidder in some other manner. (*Id.*)

8. The contracting officer and the purchasing agent look at the anticipated procurement and make a determination as to how, if any, the purchase will be set aside. (D.I. 7 at 4.) Then a record of set-aside action (DLA Form 1360) is filled out by the purchasing agent, reviewed by the contracting officer, and signed. (D.I. 8 at 10.) Then the form is reviewed by the Small and Disadvantaged Utilization Specialist for the DGSC. (*Id.*) The standards for both partial and total set-asides are codified in the Armed Services Procurement Regulations. 32 C.F.R. §§ 1–700 to 1–707 (1983).

9. A labor surplus area is defined as a geographic area which at the time of the award is classified and listed as such by the Department of Labor. 32 C.F.R. § 1–801.2 (1983). The term "labor surplus area concern" means a concern that agrees to perform or cause to be performed a substantial proportion of a contract in labor surplus areas. A concern shall be deemed to perform a substantial proportion of a contract in labor surplus areas if the aggregate costs that will be incurred by the concern or its first tier subcontractors, on account of manufacturing or production performed in labor surplus areas amount to more than 50% of the contract price. 32 C.F.R. § 1–801.1 (1983).

10. The Armed Services Procurement Regulations provide that a manufacturer is considered a "small business" concern if the number of employees of the concern *and its affiliates* does not exceed 500 persons. 32 C.F.R. § 1–701.-1(b)(8) (1983). Although the Chase Foster Division of Keene in Bear, Delaware, only employs approximately 150 people, Keene Corporation, the bidder, employs more than 500 people and thus does not qualify as a small business concern. (D.I. 15 at 2.)

mended that this solicitation be classified as a 50% set-aside for labor surplus area concerns. (D.I. 19 at 12A, 58A.) The DLA Form 1360 with Peck's recommendation was then forwarded for review to Harvie on October 25, 1979.[11] (*Id.*)

When Harvie reviewed the prior solicitation he noticed that Markel's exception to the government's packaging requirements had caused Markel's bid to be ruled non-responsive. (D.I. 7 at 9; D.I. 8 at 39, 40.) Harvie then contacted Markel to determine whether or not they were aware of the fact that the exception they took to the packaging of items 1 and 2 on the August 2, 1979 bid caused their bid to be ruled non-responsive. (D.I. 7 at 9.) Harvie then suggested that Markel consider subcontracting for the packaging of these two items. (D.I. 7 at 10.) Subsequently, Markel advised Harvie that they would bid with no exceptions and in accordance with the government's specifications. (*Id.*) As a result of this discussion with Markel, Harvie recommended that the solicitation be changed to a total small business and labor surplus area set-aside.[12] (D.I. 19 at 12A; D.I. 7 at 8–10; D.I. 8 at 37–40.) Thereafter, Peck agreed with Harvie's recommendation for DLA 400–80–B–0065. (D.I. 8 at 43.)

As a result of the November 28, 1979 solicitation for black electrical tape, three bids were received:[13] two from small business manufacturers Moxness and Markel, and one from a small business dealer. (D.I. 19 at 14A–15A.) The contract, DLA 400–80–C–0844, was awarded to Moxness at $3.80 per roll for items 1 and 2 and $3.30 per roll for items 3 through 5. (*Id.* at 15A.)

The next solicitation for black electrical insulation tape was issued on June 15, 1981, as DLA 400–81–B–4496. (*Id.* at 16A.) The solicitation was designated by Peck as a total small business set-aside. (D.I. 8 at 63.) The bids were opened on July 15, 1981 and three bids from small business concerns were received: Markel, Moxness and Insulectro. (D.I. 19 at 16A.) Insulectro, a small business dealer, was low bidder on items 1 and 2 ($4.25 per roll). Moxness was low bidder on items 3 through 5 ($3.69 per roll). (*Id.*) However, the contract with Insulectro (DLA 400–81–C–0103) was subsequently cancelled when DGSC discovered that Insulectro intended to furnish material for the contract which was manufactured by Keene, a large business concern. (*Id.* at 16A; D.I. 8 at 55, 64.) That quantity which was part of the contract awarded to Insulectro was not resolicited, rather, that quantity was added to the next solicitation. (D.I. 8 at 64.)

On September 28, 1981, Keene submitted an unsolicited bid proposal to supply the material requested in the solicitation issued on June 15, 1981, DLA 400–81–B–4496. (D.I. 19 at 18A.) The proposal urged the contracting officer to withdraw the 100% small business set-aside and accept Keene's bid of $4.17 per roll for item 1, $4.14 per roll for item 2 and $3.50 per roll for items 3 through 5. (*Id.*) Keene also proposed that in the alternative, the government resolicit the black electrical insulation tape. (*Id.*)

On October 2, 1981, Peck responded in writing to the Marketing Director of Keene that the unsolicited bid was late and non-responsive in that it did not meet the terms and conditions of the small business solicitation.[14] (D.I. 19 at 19A; D.I. 8 at 66.)

---

**11.** The SBA representative reviews each file and each procurement before it is solicited to make sure that a "fair proportion" of contracts are placed with small business concerns. (D.I. 8 at 10.) *See also* 32 C.F.R. § 1–702(a).

**12.** The record of set-aside action states in the comment section: "changed from 50% LSA to combined S/B/LSA SA per agreement M. Jones & J. Harvie 25 Oct. 79 See HPA approval attached." (D.I. 19 at 12A.)

Also on October 25, 1979, Harvie sent a letter outlining his recommendation to the Head of the Procuring Activity, William D. Curry, Jr. On October 29, 1979, Curry approved Harvie's request. (*Id.* at 13A.)

**13.** The bid opening time was set for December 28, 1979, and three bids were received on that date. (D.I. 8 at 38.) On December 31, 1979, a fourth bid was received from Bishop Electric. (*Id.*) However, since the bid was late it was held unopened in the file pursuant to the regulations. (*Id.* at 39.)

**14.** Peck's letter to Keene stated in part:

The subject Invitation for Bids was opened at 11:15 a.m. on 15 July 1981. Paragraph 2–302 of the DAR provides that bids shall be submitted so as to be received in the designated office not later than the exact time set for opening of bids. Bids received after the exact

On November 18, 1981, a subsequent solicitation for black electrical insulation tape was issued as DLA 400–82–B–0977. (D.I. 19 at 21A.) This solicitation was also designated by Peck as a total small business set-aside. (*Id.* at 4A.) The bidding was opened on December 18, 1981, and two small business concerns, Markel and Moxness, submitted bids. (*Id.* at 21A.) Moxness was awarded the contract at a price of $4.49 per roll for items 1 and 2 and $3.58 per roll for items 3 through 5. (*Id.* at 22A.)

With respect to red electrical insulation tape, the last solicitation which was not a total small business set-aside, was issued on May 5, 1980 as DLA 400–80–B–2581. (D.I. 19 at 23A.) Prior to the issuance of that solicitation, Peck determined that the solicitation would be designated as a 50% small business set-aside. (D.I. 19 at 5A.) On June 4, 1980, five bids were received at the bid opening: two small business manufacturers, Markel and Moxness, one small business dealer and two large business manufacturers, Keene and Bishop Electric. (D.I. 19 at 23A.) Keene was awarded the non-set-aside portion of the procurement in contract number DLA 400–80–C–2374 at $3.70 per roll for item 1 and $3.40 per roll for items 2 through 4. (*Id.* at 24A.) On August 18, 1980, Moxness was awarded the small business set-aside portion of the contract DLA 400–80–C–2877. (*Id.* at 5A.)

As a result of the Markel and Moxness bids on the June 1980 solicitation, Harvie recommended that the next solicitation for red electrical insulation tape be designated a total small business set-aside. (*Id.* at 27A.) The bid opening occurred on December 10, 1980, wherein three small business concern bids on DLA 400–81–B–0762 were

received. (*Id.* at 25A.) Moxness was awarded the contract (DLA 400–81–C–1413) at $4.10 per roll for items 1 and 2 while Markel was awarded the contract (DLA 400–81–C–1412) at $3.50 per roll for items 3 through 5. (*Id.* at 26A.)

Finally, on February 4, 1981, red electrical insulation tape was solicited in DLA 400–81–B–1981. (*Id.* at 6A.) On January 19, 1981, Peck designated the solicitation as a total small business set-aside. (*Id.* at 28A.) On January 20, 1981, Harvie concurred with Peck's designation. (*Id.*) Two small business concerns, Markel and Moxness, responded to the invitation. (*Id.* at 29A.) Moxness was awarded items 1 and 2 at $4.25 per roll. (*Id.*) Markel was awarded items 3 through 5 at $3.50 per roll. (*Id.*)

As a result of the total small business set-asides for black and red electrical insulation tape, Keene has been precluded from bidding on the solicitations. Thereafter, Keene filed this suit on December 23, 1981, questioning the validity of the set-aside determinations and requesting this Court to enjoin permanently the United States from soliciting black and red silicone rubber tape on a total small business set-aside basis. (D.I. 1.)

## III. DISCUSSION

### A. *Keene's Challenges*

In order to focus on the issues in the present case, it is important to note at the outset, the issues that are *not* in dispute. Keene is not asserting that Markel and Moxness are not responsible small business firms. (D.I. 20 at 9.) Secondly, Keene is not questioning the validity of the applicable regulations in this case. (*Id.* at 10.) Thirdly, Keene does not contend that the

---

time set for opening shall be considered late bids and may not be considered for award, unless circumstances outlined in DAR 7–2002.2 are applicable.
. . . .
Your wire of 9 September 1981, offering prices for the subject IFB, is therefore considered to be a late bid under the provisions cited above. . . .
Three competitive bids were received, from two small business manufacturers and a dealer offering the product of a small business. Awards were made following the Contracting

Officer's determination of fair and reasonable prices. The prices contained in your wire represent reductions of 2% below the award price of Items 0001 and 0002 and approximately 4% below prices of Items 0003–0005, and were received after timely bid prices were revealed. They do not indicate adequate savings to justify removal of the Small Business Set-Aside designation on the basis of unreasonable prices. It is considered that adequate small business competition exists from responsible manufacturers at reasonable prices. (D.I. 19 at 19A.)

Armed Services Procurement Regulations invalidly limit competition on their face. (*Id.*) Finally, Keene is not seeking to enjoin the performance of any contracts already awarded. (*Id.* at 12.)

With respect to the issues in dispute, Keene is challenging whether or not Markel and Moxness submitted past responsive bids and whether Peck's decision to change to a total small business set-aside had a rational basis. (*Id.* at 9.) Secondly, Keene is challenging the application of the pertinent regulations in this case. (*Id.* at 10.) Thirdly, Keene argues that reliance upon previous non-responsive bids in violation of the regulation undermines competition and therefore, it cannot provide a rational basis for a decision to change to a total small business set-aside. (*Id.*) Finally, Keene is requesting that the total small business set-aside designation be overruled and that it be allowed to participate in future procurements of electrical insulation tape. (*Id.* at 12–13.)

### 1. *Standard of Review of an Agency Decision*

 With respect to the issue of judicial review of a contracting officer's decision, since it is a question of judgment or discretion, the reviewing court shall only hold unlawful and abrogate an agency's action, findings, or conclusions if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (1977). Such a standard of review goes to the reasonableness of that agency's action on the basis of the record before it. *United States v. Bianchi*, 373 U.S. 709, 715, 83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963). A showing of clear illegality is the appropriate criterion to impose upon an aggrieved bidder who seeks judicial relief under the Administrative Procedure Act. *Sea-Land Service Inc. v. Brown*, 600 F.2d 429 (3d Cir.1979).

In *Steinthal & Co. v. Seamans*, 455 F.2d 1289 (D.C.Cir.1971), the Court noted that:

The court is obligated to restrict its inquiry to a determination of whether the procurement agency's decision had a reasonable basis. This inquiry must fully take into account the discretion that is typically accorded officials in the procurement agencies by statutes and regulations. Such discretion extends not only to the evaluation of bids submitted in response to a solicitation but also to determination by the agency with respect to the application of technical, and often esoteric, regulations to the complicated circumstances of individual procurements. The soundness of this approach is underscored by the special terminology and doctrines that have evolved in ASPR, and what might fairly be called the "common law of government procurement" —a body of rulings and determinations emanating from executive officials and the uniquely situated Comptroller General, quasi-judicial boards, and courts. If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations. Otherwise, the courts would become the forum for all manner of objections to procurement decisions—objections that counsel can readily relate to the language of some provision or other in some procurement regulation—and would be propelled without adequate preparation into a tangle of complex statutory and decisional rules.

455 F.2d 1289, 1301 (D.C.Cir.1971). (Citations omitted.)

In three recent cases the Court of Appeals for the Third Circuit has outlined the standards governing the grant or denial of injunctive relief requested by a disappointed bidder. *See Princeton Combustion Research Lab. v. McCarthy*, 674 F.2d 1016 (3d Cir.1982); *Allis-Chalmers Corp. v. Friedkin*, 635 F.2d 248 (3d Cir.1980); *Sea-Land Service, Inc. v. Brown*, 600 F.2d 429 (3d Cir.1979). These cases have stated that the district court's review of an agency's purchasing decision including its interpretation of procurement regulations is extremely limited in scope. *See Princeton Combustion Research*, 674 F.2d at 1021.

The district court is not to substitute its judgment for the agency's, but may only

act when an agency's decision is found to be irrational. Even if the district court finds that the agency's decision lacks any reasonable basis, moreover, it does not automatically follow that plaintiff is entitled to injunctive relief. "Judicial intrusion into government purchases necessarily delays completion of the contract and increases costs, with little measurable benefit to the public." *Allis-Chalmers Corp. v. Friedkin,* 635 F.2d at 252–53. Thus, even if the district court finds that the agency's decision was irrational, the district court nevertheless has discretion to decide whether to grant or deny the injunction.

674 F.2d at 1021–22.[15]

 While contracting officers may not act illegally, they are entitled to exercise discretion upon a broad range of issues confronting them, including "considerations of price, judgment, skill, ability, capacity and integrity" in the solicitation of business with whom the government will enter into contracts. *Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260, 1277 (5th Cir. 1978) (quoting *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859, 869 n. 10, 874 (D.C.Cir.1970)).

 The question before the Court is *not* whether the contracting officer's decision to change to a total small business set-aside was right or wrong. Instead, this Court must determine whether or not the contracting officer's decision was "the result of a *considered process,* rather than an arbitrary and capricious choice based on factors lacking *any* intrinsic rational basis or relationship to the questions at issue." *See Kinnett Dairies, Inc. v. Farrow,* 580 F.2d at 1277 (emphasis added). In addition, there is a heavy burden on Keene to show that Peck's decision on matters committed primarily to his own discretion had *no rational basis. See Kentron Hawaii Ltd. v. Warner,* 480 F.2d 1166 (D.C.Cir.1973).

### 2. Total Small Business Set-Aside Guidelines

The controversy here arises out of a total small business set-aside designation made by Peck for the procurement of black and red electrical insulation tape. Peck, as the contracting officer for DGSC, made this determination pursuant to the Armed Services Procurement Act and the Armed Services Procurement Regulations, the statutory authority which establishes the policy under which the DGSC purchases supplies and equipment. 10 U.S.C. § 2305(a) (1983) and 32 C.F.R. § 1–706.5(a)(1) (1983). The Act provides in pertinent part that: "It is also the policy of Congress that a fair proportion of the purchases and contracts . . . be placed with small business concerns." 10 U.S.C. § 2301(b) (1983).[16]

---

15. The court in *Steinthal* focused on two interrelated principles which must be considered when the court is faced with an emergency challenge to the determinations of procurement officials: (1) courts should not overturn any procurement determination unless the aggrieved bidder demonstrates that there was no rational basis for the agency's decision; and (2) even in instances where such a determination is made, there is room for sound judicial discretion, in the presence of overriding public interest considerations, to refuse to entertain declaratory or injunctive actions in a pre-procurement context. 455 F.2d at 1301.

16. This policy was enhanced by the enactment of the Small Business Act where it is stated in part that:

The essence of the American economic system of private enterprise is free competition. Only through full and free competition can free markets, free entry into business, and opportunities for the expression and growth of personal initiative and individual judgment be assured. The preservation and expansion of such competition is basic not only to the economic well-being but to the security of this Nation. Such security and well-being cannot be realized unless the actual and potential capacity of small business is encouraged and developed. It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, *and to maintain and strengthen the over-all economy of the Nation.*

The Armed Services Procurement Regulations set forth the rules by which the DOD through the DGSC can implement the requirements and policies of these statutes. *See* 32 C.F.R. § 1–700 to 32 C.F.R. § 1–708 (1983). The particular regulation regarding the requirement for a total set-aside of a procurement for small business concerns reads in part, as follows:

> [T]he entire amount of an individual acquisition or class of acquisitions, ... shall be set aside for exclusive small business participation (1–701.1) if the contracting officer determines that there is a *reasonable expectation* that (i) offers will be obtained from at least two responsible small business concerns offering the products of different small business concerns and (ii) awards will be made at reasonable prices (1–706.3(a)). Total set-asides shall not be made unless such a reasonable expectation exists .... Although past acquisition history of the item or similar items is always important, it is not the only factor to be considered in determining whether a reasonable expectation exists.

32 C.F.R. § 1–706.5(a)(1) (1983). (Emphasis added.) The application of these standards by the contracting officer now forms the basis of Keene's complaint. (D.I. 1 at 1.)

Keene contends that: (1) the contracting officer lacked the requisite "reasonable expectation" that at least two responsible small business concerns would submit future adequate bids; and (2) the total set-aside precludes competition where one of the two small business firms involved had submitted a non-responsive bid in the past and the other small business concern repeatedly had been granted post-award devi-

ations from the specifications set forth in the DGSC's original invitation for bids. (D.I. 15 at 7, 13 and D.I. 20 at 3.)

Keene argues that the DGSC's alteration of its procurement policy with respect to electrical insulation tape from a 50% small business set-aside to a 100% small business set-aside thus was arbitrary, capricious, an abuse of discretion, without a rational basis and otherwise not in accordance with the law. (D.I. 1 at 6.) Keene bases its contention on two arguments: (1) that Markel's bid just prior to the decision to establish a total small business set-aside was non-responsive because it took exception to the packaging specifications; and (2) the only other small business concern (Moxness) which bid on August 2, 1979, DLA 400–79–B–2610, just prior to the decision to establish a total small business set-aside, submitted defective bids inasmuch as Moxness was improperly permitted to deviate from the contract requirements after Moxness was selected as low bidder. (D.I. 15 at 7–8.) Therefore, Keene contends that the DGSC had no factual basis to reasonably expect that at least two responsible small businesses would submit adequate bids in the future. (D.I. 20 at 5.) The Court finds this argument to be without merit.

### 3. Contracting Officer's Determination—"Reasonable Expectation"

#### a. Markel's Exception to the Packaging Requirements

The last solicitation for black electrical insulation tape which was not a total small business set-aside occurred on July 13, 1979. (D.I. 19 at 11A.) On August 2, 1979, six bids were received. (*Id.* at 1A.) Two

---

15 U.S.C. § 631(a) (1976).

In 1958, the Small Business Act was amended to provide some guidance to the procurement agencies of the government in the enforcement of these Congressional mandates by indicating that small business concerns shall receive any award or contract when it is determined:

(1) to be in the best interest of maintaining or mobilizing the Nation's full productive capacity,

(2) to be in the interest of war or national defense programs,

(3) to be in the interest of assuring that a fair proportion of the total purchases and contracts for property and services for the Government are placed with small business concerns, or

(4) to be in the interest of assuring that a fair proportion of the total sales of Government property be made to small business concerns ....

15 U.S.C. § 644(a) (1976).

small business firms, Markel and Moxness, submitted bids. (*Id.*) Markel, in submitting its bid, noticed an exception to item 1 and 2 of the solicitation as required under the specifications. (*Id.* at 10A.) The exception taken by Markel concerned not the product but the type of packaging. (*Id.* at 71A.) Items 1 and 2 of the solicitation, which were for Navy installations in Norfolk, Virginia and Oakland, California, were required for overseas destinations which necessitated a higher level of unit packaging. (*Id.*) When Harvie was reviewing the August 2, 1979 procurements for small business and labor surplus set-aside potential, he noticed the exception taken by Markel. (D.I. 7 at 9.) Upon seeing this, Harvie contacted Markel to determine whether or not Markel was aware that the exception it took on DLA 400–79–B–2610 made its bid non-responsive on items 1 and 2. (*Id.* at 9.) After discussing the problem, Markel informed Harvie that it would bid in the future with no exception and that it would bid in accordance with the specifications. (*Id.* at 10.) Based upon that representation, Harvie concluded that there was a reasonable expectation that Markel would bid with no exception and would bid competitively on the next procurement. (*Id.*) Even though Peck had

recommended that the next procurement be a 50% labor surplus set-aside, Harvie recommended, based upon his discussion with Markel, that procurement be a combined 50% labor surplus/100% small business set-aside. (D.I. 19 at 12A–13A.) This change was agreed to by Peck. (D.I. 8 at 41.)

■ The decision to change to total set-asides comes within the discretion of the contracting officer. 32 C.F.R. § 1–706.-5(a)(1). However, the Court's inquiry is whether or not Peck had a "reasonable expectation" [17] that two responsible business concerns would make reasonable bids at the next solicitation. It is the contracting officer's *expectation of future actions* that forms the gravamen of this case.

■ The record presented demonstrates that at the time Peck made the determination to change the November, 1979 procurement of black electrical insulation tape a total small business set-aside, he considered all the relevant factors relating to the total small business set-aside and made a rational decision to change the procurement. As the facts have shown, Peck made his decision of reasonable expectation after a careful review of the prior solicitation, the price indices established by the

**17.** In the decisions of the Comptroller General, it has been stated that the contracting officer may exercise broad discretion in making his determination of "reasonable expectation." In one decision the Comptroller General stated:

The extent of this discretion is evidenced by a review of our decisions in the area. There is no requirement that the contracting activity perform an in-depth survey prior to initiating a small business set-aside. *See U.S. Divers Company,* B–192867, February 26, 1979, 79–1 CPD 132. The past procurement history of the item or similar items is always an important factor. DAR § 1–706.5(a)(1); *Tufco Industries, Inc.,* B–189323, July 13, 1977, 77–2 CPD 21. In this regard, we have upheld a set-aside determination where the basis was the fact that competitive bids were received from two small businesses on the previous procurement. *See,* for example, *KDI Electro-Tec Corporation,* B–185714, June 8, 1976, 76–1 CPD 364. We have approved a contracting officer's decision to set-aside a procurement where the contracting officer relied solely upon a commodity source list to. determine that there were a sufficient number of respon-

sible small businesses which could be expected to bid so that award could be made at a reasonable price. *Wyle Laboratories,* B–186526, September 7, 1976, 76–2 CPD 223. We have even upheld a contracting officer's determination in this regard where only one bid from a small business concern was received in response to the solicitation. *See U.S. Divers Company, supra.* Since the circumstances of each procurement are unique, there can be no simple formula for making such business judgments. In any event, if after receipt of bids a contracting officer determines that there is not sufficient small business participation or that awards cannot be made at reasonable prices, a contracting officer may properly withdraw the set-aside in accord with DAR § 1–706.3(a). *See Hein-Werner Corporation,* B–195747, May 2, 1980, 80–1 CPD ——, where we indicated that doubt as to the number of responsible small businesses expected to compete could be resolved by opening bids to determine the propriety of the set-aside.

*See* Comp.Gen. B–195431 at 10–11 (June 23, 1980).

DOL and the recommendations made by Harvie.[18]

### b. *Moxness' Post-Award Deviation Requests*

Keene's second argument relates to the post-award deviation requests which had been made by Moxness. (D.I. 15 at 8.) Keene argues that the prior bids of Moxness were defective because Moxness improperly was permitted to deviate from the contract requirements after it had been selected as low bidder. (*Id.*) In support of this argument, Keene notes that: "[a]ccording to Mr. Peck, a June 1, 1979, letter by M.B. Goodwin, Contracting Officer, Director of Procurement and Production, states that Moxness *always* requests deviations after an award and that the deviation results in a ten to fifteen percent cost savings to the contractor." (*Id.*) Keene concludes: "[a] reasonable expectation cannot be based upon invalid bids. Therefore, as a matter of law, the Government's conduct here is unreasonable." (*Id.* at 9.)

With respect to Keene's second argument, the record also shows that Peck made a rational decision of a future reasonable expectation after a careful consideration of all the relevant factors before him at that time. In the solicitation on August 2, 1979 (DLA 400–79–B–2610), Moxness submitted a competitive and responsive bid. (D.I. 19 at 8A.) In a prior solicitation (DLA 400–79–C–1296) after Moxness was awarded the contract, it did request a post-award deviation. (D.I. 7 at 21; D.I. 8 at 19, 57.) However, this request was sent to M.B. Goodwin, Director of Procurement and Production (Post-Award Branch). (D.I. 8 at 57.) There is no evidence to support Keene's position that Peck was aware that Moxness would be unable to perform the contract at the bid price. Based upon the facts known to Peck at the time he made his decision to restrict the procurement of black electrical insulation tape, there was nothing to indicate that he was aware of any reason why Moxness would not *submit* a reasonable and *responsive bid* at the next solicitation.[19] (D.I. 8 at 57–61.)

**18.** With respect to the Markel exception in the August 2, 1979 solicitation, Peck stated:

Well, when a firm is declared non-responsive for taking exception to a bid, we write them a letter and tell them why, and because he had been bidding over the years and not taking exception, this was kind of a one-time thing—I think it would be reasonable to assume that if somebody told you that you can't take exceptions to bids and get awards, that you wouldn't take them in the future.

D.I. 19 at 36A.

**19.** In his deposition, Peck's position with respect to the Moxness' post-award requests was stated as follows:

To start out with, I want to say this is a post-award action, which I have never seen before, and without going back and reading the record I really can't comment on it except—

Q Well, why don't we read it into the record, the green sheet, so we know what we are talking about when you do start to talk about it.

A On a form entitled or numbered DD–1694 and dated 14 March 1979, the Quality Control Manager of Decas for the Moxness plant sent a request and requested deviation on the edge tolerance on the tape and the tolerance, is asking for a change in thickness in accordance with the specification. And there is a letter from the firm, Moxness, requesting a deviation as specified on the partic-

ular form. And on the 23rd of May 1979, this deviation was authorized.

Q Now, that was authorized by a gentleman, M.B. Goodwin, Contracting Officer, Director of Procurement and Production. Is he in your agency?

A Yes, sir.

Q He is on a parallel level with you in Contracting?

A He is in the Post-Award Branch which administers contracts.

Q Now, following his approval he wrote a letter to yourself—

A Yes.

Q That is dated June 1, 1979, consisting of three paragraphs, and the second paragraph reads:

"Deviations always requested after award by Moxness. It is estimated that the deviation results in a 10 to 15 per cent cost savings to the contractor."

The third paragraph reads:

"It is requested that in awarding the future solicitations that the offering of this non-conforming tape be resolved prior to award."

That is signed by Mr. Goodwin.

Do you recall the communication?

A No, sir.

Q Do you know if the specifications for the tape were ever changed?

A No, sir.

Q Do you know if Moxness still always asks for deviation whenever they get an award?

Even assuming for the sake of argument that Peck was aware of a post-award deviation request by Moxness, Peck's decision to change to a total small business set-aside would stand as long as Peck considered all of the relevant factors before him and drew a rational conclusion. First of all, the post-award request is subject to the approval of the DGSC. (*See* D.I. 8 at 19.) Additionally, if a post-award deviation was approved it is not unreasonable to expect a company to submit a competitive responsive bid at the next solicitation request. This is a matter of discretion for the contracting officer. *See Trilon Educational Corp. v. United States*, 578 F.2d 1356, 217 Ct.Cl. 266 (1978). Absent a showing of clear illegality, this Court should exercise restraint in interfering with procurement decisions. *See Sea-Land Service, Inc. v. Brown*, 600 F.2d 429, 434 (3d Cir.1979). There has been no such showing or even an allegation of illegality by Keene.

4. *Awards Made At Reasonable Prices*

With respect to price, Markel and Moxness had been competitive in the August 2, 1979 solicitation.[20] (D.I. 19 at 8A–10A.) This was the solicitation that Peck reviewed prior to his October 1979 decision to make the next procurement a total small business set-aside. (*Id.* at 10A.) The November 18, 1979 solicitation for DLA 400–80–B–0065 resulted in three small business concerns. (*Id.* at 14A.) The lowest bidder, Moxness, was only $.30 over the bid previ-

ously provided by Keene for items 1 and 2 and $.05 over the bid previously provided by Keene on items 3 through 5. (*See* D.I. 19 at 15A, 66A–67A.)[21]

With respect to the red electrical insulation tape, the relevant and material facts establish that Peck made a rational decision after a careful review of the situation before him at the time. The May 5, 1980 solicitation for red electrical insulation tape resulted in the submission of bids by three small business concerns. (Id. at 23A.) Harvie reviewed this solicitation in October of 1980 and he recommended to Peck that the next procurement be a total small business set-aside. (*Id.* at 27A.)[22] Harvie's recommendation was based on the fact that on the invitation for bid DLA 400–80–B–2581 of June 4, 1980, three small business concerns submitted responsive bids. (*Id.* at 23A, 24A.) The next solicitation for red electrical insulation tape occurred on December 10, 1980. (*Id.* at 6A.) The procurement was a total small business set-aside and Moxness was awarded the contract for items 1 and 2 at $4.10 per roll while Markel was awarded the contract for items 3 through 5 at $3.50 per roll. (*Id.* at 25A, 26A.) Subsequent solicitations for red electrical insulation tape as a total small business set-aside have been issued. In response to a January 19, 1981 solicitation, two small business concerns, Markel and Moxness, submitted responsive bids.[23] (*Id.* at 29A.)

A No, sir.
Q You don't know or—
A I don't know.
D.I. 8 at 57–58.

**20.** Invitation for bid DLA 400–79–B–2610 of August 2, 1979 shows Keene was the low bidder at $3.50 per roll for items 1 and 2, and $3.25 per roll for items 3 through 5. Moxness bid $3.75 per roll for items 1 and 2, $3.45 per roll for items 3 through 5, Markel bid $3.89 per roll for items 1 and 2, $3.29 per roll for items 3 through 5. (D.I. 19 at 8A–10A.)

**21.** On the August, 1979 invitation for bid DLA 400–79–B–2610, Keene bid $3.50 per roll for items 1 and 2 and $3.25 per roll on items 3 through 5. (D.I. 19 at 8A–10A.) On the December 28, 1979 invitation for bid DLA 400–80–B–0065, Moxness bid $3.80 per roll for items 1 and 2 and $3.30 per roll for items 3 through 5. (*Id.* at 14A–15A.)

**22.** The Record of Set-Aside Action for 81–B–0762 dated October 16, 1980, shows that the contracting officer initially recommended a 50% small business set-aside but later changed his recommendation to 100%. Harvie "nonconcurred" in the original decision stating: "Recommend 100% SB SA. Markel & Moxness both SB bid competitively on IFB 80–B–2581." (D.I. 19 at 27A.)

**23.** The set-asides with regard to the black and red electrical tape have continued in accordance with the regulations set forth in 32 C.F.R. § 1–706.1(f). In essence, that regulation states that once a product has been successfully contracted as a small business set-aside, all future requirements of that office for that particular product shall be acquired on that basis, unless it is determined by the contracting officer that there is no reasonable expectation that offers will be obtained from at least two reasonable small business concerns and that the awards

### B. *Summary Judgment Motions*

Rule 56(c), Fed.R.Civ.P., provides that a court may enter summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." When ruling on a summary judgment motion, courts must "resolve any doubt as to the existence of genuine issues of fact against the moving party." *Continental Insurance Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982); *Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402, 405 (3d Cir. 1981). Also, any reasonable inferences from the facts must be resolved in favor of the party against whom the judgment may be entered. *Peterson v. Lehigh Valley Dist. Council, United Bhd. of Carpenters and Joiners,* 676 F.2d 81, 84 (3d Cir.1982).

In the present case, there are no facts to indicate that the contracting officer did not make a rational decision to change the procurement of red and black electrical insulation tape to a total small business set-aside. The facts do indicate that the contracting officer carefully reviewed the prior solicitations, the bids submitted and the recommendations of the Small and Disadvantaged Utilization Specialist for the DGSC. Based upon these factors and the contracting officer's use of discretion for predicting future expectations, this Court finds that there is a rational basis for the contracting officer's decisions to make the procurements of red and black electrical insulation tape a total small business set-aside and that these decisions are in accordance with the requirements of the statute.

Because this Court has found that the agency's future procurement decisions were rational, the Court's inquiry is at an end.[24]

In considering the United States' cross motion in a light most favorable to Keene, there are no material facts in dispute that tend to show that the United States, through its agents, acted arbitrarily, capriciously, without a rational basis, abused its discretion or violated any statutory or regulatory provision. Based on the pleadings, depositions, exhibits and affidavits, this Court concludes that the decision of the United States through its agents, to classify the procurement of electrical insulation tape as a small business set-aside was reasonable and in accordance with the regulations promulgated by the Department of Defense.

Therefore, Keene's motion for summary judgment will be denied and the United States' cross motion for summary judgment will be granted.

An order will be entered in accordance with this Opinion.

---

will not be made at reasonable prices. Since the prices set forth in the bid abstracts reflect competitive bidding by at least two small business concerns at reasonable prices, the decision

to continue the uses of small business set-asides has been appropriate. (D.I. 19.)

**24.** *See Princeton Combustion Research Lab. v. McCarthy,* 674 F.2d 1016, 1022 (3d Cir.1982).